Argued September 13, reversed and remanded December 19, 1950

# FOUCHEK ET AL. v. JANICEK

225 P. (2d) 783

*Frank J. Healy* and *Charles H. Heltzel,* of Salem, argued the cause and filed briefs for appellants.

*Bruce Spaulding* and *George A. Rhoten,* of Salem, argued the cause for respondent. With Bruce Spaulding on the brief were Rhoten & Rhoten, of Salem.

Before BRAND, Acting Chief Justice, and BAILEY*, HAY, LATOURETTE and WARNER, Justices.

WARNER, J.

This is a suit to establish a constructive trust in the hands of defendant and compel him to account for the profits arising therefrom.

---

* Bailey, J., retired November 15, 1950.

Stephen J. Fouchek and Harry L. McBurnett, plaintiffs and appellants, allege that in 1946, they were copartners with Duane J. Janicek, defendant and respondent, doing business under the assumed firm name of Salem General Jobbing Company (hereinafter called the Salem Company). They claim that while that relationship subsisted, Janicek breached faith with them by turning to his personal account and profit a valuable business opportunity which properly belonged to the Salem Company. The transaction referred to springs from Janicek's alleged secret acceptance of an offer made to the partnership which carried the promise of $50,000.00 or more for the Company's use in buying war surplus supplies in a joint adventure arrangement wherein the Salem Company would be a party with an interest slightly in excess of fifty per cent. Janicek's espousal of the offer referred to (which we shall hereinafter call the Hickok offer) resulted in the formation of a joint adventure arrangement known as the Cascade Mercantile Co., Oregon, Ltd. (hereinafter called the Cascade Company) in which defendant owns a fifty-one per cent interest to the exclusion of plaintiffs. Plaintiffs pray that Janicek be decreed to hold two-thirds of his interest in the Cascade Company as a trustee for their use and benefit, and that he be required to account to them for all monies received by him in that capacity. Defendant's answer denies any partnership relation with plaintiffs. Janicek admits, however, that the parties made what he calls a tentative agreement whereby at a future time, following August 10, 1946, he would associate himself with them as a partner but denies that the arrangements for the formation of that partnership were ever completed. He also denies that he breached faith with plaintiffs. After trial the circuit court entered a decree

dismissing plaintiffs' complaint, from whence they appeal.

From March 28, 1946, to August 10, 1946, the plaintiffs as the sole partners operated the same business under the same name. It was a wholesale and retail enterprise with its principal office in Salem, Oregon, and from June 21, 1946, with a retail branch in Taft, Oregon. Then, as well as after August 10, 1946, the firm was engaged in the selling of sporting goods and substantial lines of war surplus items which they, as war veterans, were able to obtain on a preferential status.

The business, as operated by the plaintiffs, so prospered that it seemed to dictate the need for additional assistance in the operation of its affairs. This prompted them to solicit the services of the defendant, a fellow war veteran whom they had known before and who was then employed in Seattle, Washington. In response to plaintiffs' invitation, Janicek came to Salem, Oregon, in August, 1946. Here he surveyed plaintiffs' business establishment but declined to accept their invitation to join them as an employee. Instead, he offered to come if accepted as a full partner. This was readily agreed to by the parties on August 10, 1946. Indeed, the plaintiffs were so eager for his help and association that they included him as the owner of a one-third interest without demanding any present capital contribution on his part, agreeing that it might be made by withholdings from his share of the future profits. On August 21, 1946, Janicek assumed an active place in the firm. This continued up to and including November 2, 1946, when the partnership between the three parties was terminated.

██ We have above referred to Janicek as being a

member of the firm. We have done so advisedly, being persuaded that the record in this matter clearly sustains the conclusion that Fouchek, McBurnett and Janicek were copartners from August 10 to November 2, 1946. We deem it unnecessary, however, to extend this opinion by giving our reasons for that conclusion in view of the position taken and concessions made by the defendant in his brief. There we find the following statement:

"* * * that so long as the business relations of the parties continued, whether those relations were as partners, joint venturors or otherwise, the parties each owed to the other duties similar to those owed in a partnership relation."

Thus by reason of our conclusion on the issue of partnership, we find that a fiduciary relationship existed between all the parties between the last dates mentioned and that their conduct as between themselves is amenable to and should be measured by the rules applicable to partners.

In 40 Am. Jur., Partnership, 137, § 17, we read:

"It is also a fundamental characteristic of partnership that the relation existing between the partners is one of trust and confidence when dealing with each other in relation to partnership matters. Each partner is, in one sense, a trustee and at the same time a cestui que trust."

Before proceeding to discuss plaintiffs' contentions respecting Janicek's alleged unfaithfulness as a copartner, we pause here to relate the circumstances giving rise to the Hickok offer and its content.

At all the times above referred to, Guy W. Hickok was the manager of the Salem Branch of the First National Bank of Portland (Oregon). It was the bank

where the Salem Company maintained its deposits and where it occasionally borrowed money. Mr. Hickok, on or about October 3, 1946, and for some time thereafter, at least up to and including the time of the creation of the Cascade Company, was the agent for a group of investors who were anxious to enter the then attractive war surplus market. The names of Hickok's principals did not become known to plaintiffs until after the termination of their partnership with Janicek, when they learned that they were incorporated as Capital Properties, Inc., and that Mr. Hickok was its president and one of its directors. We shall refer to these potential investors as Mr. Hickok's principals.

Shortly before October 3, Hickok called the plaintiff, McBurnett, at his place of business and asked him to stop at his desk when he, McBurnett, was in the bank. This McBurnett did on October 3 and in the conference at the bank at that time, Hickok asked McBurnett if he would be interested in obtaining some capital funds with which to increase the scope of operation of the Salem Company. Upon receiving McBurnett's affirmative reply, he proceeded to tell him that there was "a considerable sum of money available, controlled by individuals that I represented, that they were interested in going into some sort of a joint venture deal and the Salem General Jobbing Company would conduct the business, with the profits to be divided approximately equally." He indicated that the available funds represented a "probable maximum of $50,000" but that "the amount of funds was not necessarily limited." If accepted by the Salem Company, the partners of that firm were to meet with Hickok's principals and work out the details. The statement of Hickok's proposal, as outlined in this paragraph, is

what has been heretofore and will be hereinafter referred to as the Hickok offer.

Immediately after hearing Mr. Hickok's proposal, McBurnett carried the information to his copartners, Fouchek and Janicek. It was recognized as a real partnership opportunity and was seized upon with no small display of interest and avidity. We learn from Janicek that when McBurnett returned from the bank, he was "all steamed up" about what he had learned from Hickok and that "we all talked about it and decided that it would be a good deal. Any time anybody offered $50,000, we thought it would be a good deal to use." We learn from McBurnett that "the three of us agreed to accept it, and I went back to the bank and informed Mr. Hickok to that effect." This acceptance was transmitted to Hickok on the evening of October 3 or morning of October 4.

According to Janicek, the partners then proceeded to address themselves to the subject of appropriate ways to invest the funds when available. They inclined for a while to the purchase of rain parkas at a sale of war surplus supplies soon to be held by the Government at Salt Lake City; and Janicek, at the instance of his copartners, called Salt Lake City to learn more about the prospective parka sale. Although they concluded, after consideration, to abandon investment in the rain parkas, the Hickok offer, Janicek says, "was quite the subject of conversation for some time."

In the interim between the receipt of the offer and the termination of the partnership—a significant thirty days so far as the instant suit is concerned—McBurnett had further conferences with Hickok, who tells us that they numbered "two or three" over a space of "a week or ten days or two weeks." Coincident with these

further conferences between McBurnett and Hickok, the partners were apparently preparing themselves to have some constructive and profitable plan of operation to present to Hickok's principals when the anticipated meeting for negotiation was held. This is borne out by Janicek's own recital of their activities prior to November 2, 1946. This valuable opportunity was never abandoned by the partners and was yet an active subject of concern up to the time Janicek left the firm on that date. Our last statement must be read with the understanding that Janicek's continued interest in the Hickok offer as a partnership opportunity, as demonstrated by his conduct in the presence of his copartners, very soon became a pretense which deceived plaintiffs, cloaking the self-interest of his then negotiations with Hickok.

Paralleling the activities of the copartners after October 3, as outlined above, another force was set in motion which was destined to strip the Salem Company of the prospective benefits of the Hickok offer and make it a source of enrichment to Janicek alone. Just when Janicek surreptitiously began to put his self-serving design into operation, we do not know; but we are convinced beyond peradventure that it began not long after the Hickok offer was first unfolded by McBurnett to his business associates and was later brought to a point some time before November 2 where Janicek was definitely assured that he alone, and not his copartners in unity with him as the Salem Company, was to be the sole beneficiary of the funds available through Hickok's principals. We are induced by the testimony of Janicek and Hickok to conclude that their negotiations had produced that favorable end for Janicek before November 2. We emphasize that fact because in our opinion the reprehensible features of

Janicek's activity took place before he bade the plaintiffs farewell.

So well and certainly had Janicek operated prior to the closing of his partnership with plaintiffs that he was able to quickly and within four days thereafter bring his arrangements with Hickok's principals to the place where, on November 12, ten days after stepping out of the Salem Company, he was an active joint adventurer with them in the newly formed Cascade Company and the owner of a fifty-one percent interest in that company.

Those are the circumstances which form the basis for plaintiffs' claim against the defendant.

The last and principal question which remains unanswered is: Did Jancek's acts with reference to the Hickok offer constitute a breach of his obligations to his copartners so as to make him accountable to them as a constructive trustee?

In 54 Am. Jur., Trusts, 167, § 218, it is said:

"A constructive trust, or, as it frequently is called, a trust ex maleficio, ex delicto, a trust de son tort, or an involuntary or implied trust is a trust by operation of law which arises contrary to intention and in invitum, against one who, by fraud, actual or constructive, by duress or abuse of confidence, or by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy. It is raised by equity to satisfy the demands of justice."

Also see *The First National Bank of North Bend v. United States Fidelity & Guaranty Co.*, 127 Or. 147, 157, 271 P. 57.

We adopt as our own the forceful and terse words of the late Justice Cardozo, defining the obligations of joint adventurers and copartners as between themselves, which we find reported in *Meinhard v. Salmon,* 249 N. Y. 458, 463, 164 N. E. 545, 62 A. L. R. 1, 5, where he says:

"Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length are forbidden to those bound by fiduciary ties. A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty by the 'disintegrating erosion' of particular exceptions. Wendt v. Fisher, 243 N. Y. 439, 444, 154 N. E. 303. Only thus has the level of conduct for fiduciaries been kept at a level higher than that trodden by the crowd. It will not consciously be lowered by any judgment of this court."

■ The essence of the fiduciary character of a partner as defined by Justice Cardozo and the remedies flowing from its breach, as stated in 54 Am. Jur., Trusts, 167, § 218, are captured by and were succinctly written into § 79-404, O. C. L. A. As far as pertinent, that section reads:

"Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property."

The foregoing section is a part of the Uniform Partnership Law. So, too, are all the Code sections hereinafter cited.

Section 79-404, O. C. L. A., furnishes the standard by which we must determine whether or not Janicek's conduct is answerable to its provisions.

Before one can successfully invoke the penalty which § 79-404 imposes on an erring business associate, it must be demonstrated that: (1) the associate is a copartner—this we have already found in this suit; (2) the transaction is one of a kind that the partnership can legally embrace and act upon; (3) the transaction is connected with the formation, conduct or liquidation of the partnership or use of the partnership property by the accused copartner—in this suit our inquiry need go no further under this head than to determine whether the transaction is "connected with the * * * conduct * * * of the business"; (4) the transaction is of such nature that it may be said to be within the scope of the business of the firm; (5) the transaction complained of comprehends something of value to the partnership, whether or not it is of a present value or of a prospective value, which it is presently believed may accrue to the partnership in the future if and when it elects to act thereon; and (6) the transaction is one that the accused partner has acted upon to his apparent or sole advantage without the full knowledge or consent of his other partners.

We shall now proceed to weigh the Hickok offer and Janicek's actions with reference to it in terms of the elements just itemized, though not necessarily in the order above presented.

■ Our first inquiry is: Was the Hickok offer, as

made to the Salem Company, a "transaction connected with the * * * conduct * * * of the partnership"?

To be such a transaction, it necessarily follows, among other things, that it must be one upon which the partnership, as such, is legally competent to act. We recall in this connection two fundamental elements of the Hickok offer as made to McBurnett. They are: (1) it was addressed to the Salem Company as a partnership; and (2) it was to be implemented by a joint adventure arrangement by and between the Salem Company and Mr. Hickok's principals. This necessarily meant that the Salem Company, as such, would have to become a joint adventurer in a new quasi business entity, if the Hickok offer was to be accepted and acted upon. It prompts the query: Can a partnership become a copartner or joint adventurer with another partnership or joint adventurer? If it cannot, then obviously the Hickok offer was beyond the power of the Salem Company to accept and, therefore, could never be viewed as a transaction connected with the conduct of that partnership. On the other hand, if it is found that the Salem Company is not legally inhibited from becoming a joint adventurer with another, then the offer did constitute a partnership transaction which it could legally embrace and act upon, if its proposals were within the scope of the firm's business.

That eventuality, that is, of the Salem Company becoming a joint adventurer, as such does not destroy or impair the Hickok offer as a transaction contemplated by § 79-404, O. C. L. A. We find authority for this conclusion in § 79-201, O. C. L. A., which defines a partnership as "an association of two or more persons to carry on as co-owners a business for profit," when that section is read in conjunction with § 79-102,

O. C. L. A., wherein the word "person," as used in the Uniform Partnership Law, is defined as including "individuals, partnerships, corporations, and other associations." See 1 Rowley, Modern Law of Partnership, 197, § 192, where it is said: "The Uniform Partnership Act permits a partnership to enter into a partnership as a partner," citing the sections of the Uniform Partnership Law as promulgated by the Conference of Commissioners of Uniform State Laws, which are identical to §§ 79-201 and 79-102 of the Oregon Act. Our construction is also confirmed by William Draper Lewis, author of the final draft of the Uniform Partnership Act, in his article on that subject appearing in 29 Harv. L. Rev. 293.

The foregoing rule, gleaned from §§ 79-201 and 79-102, O. C. L. A., is neither new nor novel. Those sections do no more than recognize and adopt a principle of long settled law. See 1 Rowley, Modern Law of Partnership, 197, § 192; Parsons, Partnership (4th ed.) 28, § 25; Burdick, Partnership (3d ed.) 171, § 7; 1 Bates, Law of Partnership, 158, § 150; 47 C. J., Partnership, 750, § 175; *In re Hamilton,* 1 Fed. 800, 804; *Cheap v. Cramond,* 4 Barn. & Ald. 663.

If, as we have shown, the Salem Company was legally competent to participate as a party to a joint adventure arrangement, then we must further inquire whether the Hickok offer involved a transaction within the scope of the partnership enterprise. We address ourselves first to consideration of the meaning of the word "transaction" as employed in § 79-404, O. C. L. A. The word "transaction," it has been said, has never been the subject of any exact judicial definition nor given any very definite meaning by the courts. The courts have interpreted "transaction" as the justice

of each case demanded rather than by any abstract definition, and have given the word a broad, comprehensive meaning whenever necessary to meet the intention and purpose of the statute in which it was employed. 63 C. J., Transaction, 770, § 1. "Transaction" in the ordinary and popular sense has been defined as signifying "the doing or performing of any affair; that which is done or *in the process of being done,*" and again as "a matter or affair either completed or *in the course of completion.*" (Italics ours.) *Chance v. Carter,* 81 Or. 229, 236, 158 P. 947.

Within the boundaries of the foregoing definitions, we think the Hickok offer is a "transaction" in the sense that the word is used in § 79-404, O. C. L. A.

Defendant in his brief argues that: "The partnership must have owned and held *tangible asset or property* and the withdrawing partner must have taken that valuable asset or property to the detriment of the preceding partnership." (Italics ours.) We cannot accept that narrow construction. It is neither consonant with the provisions of § 79-404, nor can it be reconciled with the authorities.

The Hickok offer was a species of preemptive privilege or, better, a preemptive opportunity that was an incident of the enterprise known as the Salem Company. *Meinhard v. Salmon,* supra. It is not a sufficient answer to say that the chance which the offer presented to the Salem Company had no present value when made, because its acceptance would necessarily have to be followed by negotiations of uncertain result; and, if that stage was successful, the new joint adventure might not be profitable. "Such a calculus of probabilities is beyond the science of equity." *Meinhard v. Salmon,* supra. It is enough to constitute a given trans-

action, a business transaction under § 79-404, O. C. L. A., if it carries a reasonable prospect of future advantage, even though the anticipated values may be lost in subsequent negotiations designed to bring it to fruition. This is also true, even though it has no present market value in the hands of the partnership or cannot be made the basis of a legal claim against parties outside the firm. Present value may be an incident of it, but not necessarily so.

Information belongs to a partnership in the sense of property in which it has a valuable right, if it is of the character which might be employed to the partnership's advantage. Such information cannot be used by one partner for his private gain. *Latta v. Kilbourn,* 150 U. S. 524, 550, 37 L. ed. 1169, 14 Sup. Ct. 201; *Cassels v. Stewart,* 6 L. R. App. Cas. 64, 73.

The chance or opportunity of the Salem Company, as tendered by the Hickok offer, to make a profit by becoming a party to a joint adventure arrangement with prospective new capital up to $50,000.00, was an asset of the Salem Company in that sense until the offer was withdrawn or until repudiated by the copartners acting in concert. *Mitchell v. Reed,* 61 N. Y. 123, 129, 19 Am. Rep. 252; *Waller v. Henderson,* 135 Okla. 231, 275 P. 323.

One of the chief activities of the Salem Company was the purchase and resale of war surplus goods of divers kinds, depending in part upon the kinds which the Government offered from time to time. Hickok's principals were anxious to get into the war surplus business and the Hickok offer was made to the Salem Company with that in view. The Hickok offer was not only a transaction of the kind contemplated by § 79-404, O. C. L. A., but it was a transaction within

the scope of the business of the Salem Company, as it was then constituted. Having thus concluded, it remains to determine whether Janicek's actions with reference to the Hickok offer were without the consent of plaintiffs and in derogation of his fiduciary obligations to them.

We again focus attention upon that period beginning with the receipt of the Hickok offer by McBurnett on October 3 and ending with the dissolution of the partnership on November 2. We have already reviewed it in terms of the response it conjured in the three partners acting in unison and noted their acceptance and plans for the ultimate use of the prospective new capital funds when received by them. Now, we give consideration to the separate and secret activities of the defendant with reference to the same subject matter and which, so far as we can determine from the record, ran more or less parallel in time to his ostensible gestures of cooperation with his copartners in the Salem Company.

When we approach this phase of the matter, we are at times confronted with some difficulty, for we find that Janicek's testimony is too often vague and equivocal, where we have reason to expect that it should be clear and positive. Taking his testimony as a whole, we cannot escape the inference that the defendant shortly after hearing of the Hickok offer from McBurnett, conceived the idea of becoming its sole beneficiary; indeed, referring to his conversations with Fouchek on October 31, he says: "I told him I was endeavoring to get into the war surplus business myself." We feel certain that those "endeavors" on his part began early in October and that he, with desgin and subtlety, promoted the various conferences that

he had with Hickok at the bank during the month of October and with the purpose of destroying by suggestion and innuendo Hickok's faith and confidence in Janicek's copartners, Fouchek and McBurnett, and at the same time advance himself in Mr. Hickok's regard.

There were three conferences between Janicek and Hickok, and possibly more. The first, we are told by Janicek, was when he called upon Hickok and told him he "wanted a loan, to go into the war surplus business, —a GI loan," at which time, he added, "I said that the setup [referring to the Salem Company] was such that I couldn't see continuing on with it and that I wanted to break away and set up for myself." We think it is worthy of note that at the time it was not Mr. Hickok but Mr. Dempsie of the bank who handled the bank's loans to G. I. borrowers.

On the occasion of their second conference "a day or two later," Janicek went to Hickok to ask "what he thought of Mr. Fouchek and Mr. McBurnett," and for advice on whether or not it would be wise for him to continue as one of their copartners. This he did notwithstanding that only a day or two before he had at the first conference informed Hickok that he "couldn't see continuing" with the Salem Company and "wanted to break away." Just how far Hickok was unconsciously persuaded by Janicek at these times we cannot say; but we do note that more or less coincident with the time of these talks between defendant and Hickok, the latter was, as he expressed it, "losing confidence in their [Salem Company] setup" and "beginning to back away from them."

We find difficulty in accepting Janicek's explanation that his true objective in calling at Hickok's desk

at that time was to borrow money or to get the banker's advice and counsel concerning his associates, Fouchek and McBurnett. This difficulty is enhanced when we find, by Janicek's own testimony, that he had already and independently discovered sufficient reasons to warrant his withdrawal from partnership association with the plaintiffs and had apparently concluded to do so before seeking the further advice or counsel of Mr. Hickok.

The third significant meeting between Janicek and Hickok was "four or five days or a week later," that is, after the second conference above referred to. This third conference in October was, as stated by defendant, "before I left Barb's Sporting Goods," (a retail outlet operated by the Salem Company). It was at this meeting that the scales were finally turned in favor of Janicek and against his copartners. It was then that Hickok offered him the opportunity which had previously been tendered the Salem Company through McBurnett. Upon its immediate acceptance by the defendant, the plaintiffs were out and Janicek was in, so far as the Hickok offer was concerned.

Success in the fulfilment of Janicek's ambition to go into the war surplus business on his own account appears to this Court to have been a matter of deliberate and careful previous consideration; first to dissuade Hickok from further traffic with his copartners; then to persuade Hickok to accept him in their stead as a potential joint adventurer with Hickok's principals; and then, after being thus first assured of a place to light, so to speak, in the war surplus market, to thereafter terminate his partnership relations with the very men who, so shortly before, had placed him in the position of vantage from which he could and did

achieve, at the expense of their faith and confidence in him, the end he ultimately hoped for. In retrospect, the pattern of Janicek's departure from the ways of fiduciary rectitude now appears obvious and complete, although at the time of performance its deviousness and craftiness were not so apparent to those working closest to him.

Our conclusion that Janicek's efforts to supplant plaintiffs in the favor of Hickok, and by oblique and crafty approach win for himself the fruits of the Hickok offer, finds support in his secretive attitude toward them. His conduct in this respect does not meet the fiduciary standards of good faith required of a copartner, either in spirit or in fact.

Section 79-403, O. C. L. A., so far as pertinent, reads: "Partners shall render on demand *true and full information of all things* affecting the partnership * * * *." (Italics ours.)

Good faith not only requires that a partner should not make any false statement to his partners, but also that he should abstain from any false concealment. *Sorenson v. Nielson,* 240 N. Y. S. 250, 255; *Poss v. Gottlieb,* 193 N. Y. S. 418, 421; *Goldsmith v. Loeb,* 169 N. Y. S. 527.

When we view Janicek's conduct in terms of the foregoing rules, we find in it the very antithesis to the standards which they mandate. The Government's sale of war surplus goods scheduled for the latter part of October, 1946, was an important event in the life of the Salem Company, made particularly so by its acceptance of the Hickok offer with its prospect for greater capital to invest at that time. The firm had planned to send Janicek as its representative. He later refused to go, without assigning any reason therefor. On October

30, 1946, while at the home of Fouchek, Janicek told him that "he had other irons in the fire and that he felt it was best for him to discontinue his relationship with the partnership," and was withdrawing, but he gave no hint as to his conferences with Mr. Hickok or his impending entry into what was later to be known as the Cascade Company. On the evening of October 31 or November 1, 1946, Fouchek, whose suspicions had been aroused in the meantime, confronted defendant concerning the reasons for his imminent departure from the firm. With reference to this meeting, Fouchek testified:

"Q. (Mr. Rhoten) What did you say to him?

"A. I said [to] him, 'Jan, Harry [McBurnett] and I want to know whether or not this other iron in the fire that you mentioned last night was in any way connected with Mr. Hickok, of the First National Bank, or obtained through him.' Those were almost my precise words, because I carefully phrased the question.

"Q. What did he say to that?

"A. He waited a while and then told me 'No.' "

Upon learning of Janicek's negative reply, McBurnett on the morning of November 2 called upon Hickok, who told him "that the money that had been available had been made available to Mr. Janicek." This was followed by a spirited conference of all the partners that day. Janicek, under the pressure of Mr. Hickok's disclosures to McBurnett, admitted for the first time his theretofore undisclosed dealings with Hickok. The dissolution of the firm was its natural aftermath.

■ Janicek's surreptitious trafficking with the Hickok offer, his evasions and concealment when questioned by the plaintiffs, evidence a flagrant breach of good faith and want of open-handed dealing with his

associates warranting the condemnation of a court of equity and the application of the remedies provided by § 79-404, O. C. L. A. We repeat from *Meinhard v. Salmon,* supra: "Not honesty alone, but the punctilio of an honor of the most sensitive, is then the standard of behavior." The obligation of partners to act with the utmost candor and good faith in their dealings between themselves is not lessened by the existence of strained relations between them or the existence of any condition which might, in and of itself, justify the firm's dissolution. The fiduciary obligations of a partner remain until the relationship is terminated. *Johnson v. Peckham,* 132 Tex. 148, 120 S. W. (2d) 786, 120 A. L. R. 720 and annotations following at page 728.

■ Respondent argues that the duty of a former partner to share profits with his former associates extends only to earnings accruing before the termination of the partnership. The true rule is: When a partner wrongfully snatches a seed of opportunity from the granary of his firm, he cannot, thereafter, excuse himself from sharing with his copartners the fruits of its planting, even though the harvest occurs after they have terminated their association. The stewardship of the erring member dates from the initial appropriation and continues until he is exonerated by a proper accounting. Or to put it otherwise: If a member of a copartnership avails himself of information obtained by him in the course of the transaction of partnership business which is within the scope of the firm's business, and thereafter applies it to his own account without the consent or knowledge of his associates, he is liable to account to the firm for any benefit he may obtain from the use of such information. *Latta v. Kilbourn,* supra; *Aas v. Benham,* 19 Eng. Rul. Cas.

582, 589; 40 Am. Jur., Partnership, 221, § 133. By "information" is meant information which can be used for the purposes of the partnership. This is true no matter when his wrongful enterprise springs into profitable operation, even though it happens after the termination of the firm from whence he obtained it. *Mitchell v. Reed,* supra.

It follows that if Janicek came into possession of a partnership opportunity, which did not blossom into a thing of personal profit to him until some time after he retired from the Salem Company on November 2, 1946, the fact of such a delayed benefit to him does not exonerate him from accountability to his copartners thereafter, if his seizure and employment of that opportunity during the existence of the Salem Company was without the consent of his copartners in the Salem Company.

■ In this suit the information represented by the Hickok offer had already been affirmatively acted upon by the Salem Company to the extent of advising Hickok of the firm's interest and acceptance. Moreover, the partnership in October was engaged in making plans as to the best possible and most profitable uses of the new funds when and if arrangements were perfected with Hickok's principals. Janicek participated with plaintiffs in all these preliminary considerations arising out of the Hickok offer. He knew of them when he conferred with Hickok at the bank. He knew at that time that the Salem Company was eminently solvent; that it had had a history of successful operation and was competent to enter into the arrangement the Hickok offer necessitated. He knew, too, that the next step, so far as the Salem Company was concerned, was to arrange a meeting with Hickok's principals. He

was under a legal duty to his copartners to so inform Hickok of the Salem Company's plans and activities in furtherance of its acceptance before treating with Mr. Hickok alone for his, Janicek's, sole use and benefit. So far as disclosed by the record before us, defendant remained silent on such matters. His attitude and conduct toward plaintiffs after his meetings with Hickok belie the suggestion that he dealt with Hickok with any more candor during the period of their negotiations than he exhibited toward his copartners during the same time.

■ We hold that the information embodied in the Hickok offer was obtained by the defendant in the course of the transaction of the business of the Salem Company and was employed by him for his own use and benefit without the consent of his copartners; and by reason thereof he must, under § 79-404, O. C. L. A., account therefor to plaintiffs.

We have above referred to the First National Bank of Portland and more frequently have used the word "bank." It is only fair to say that there is nothing in the record of this litigation which identifies that institution, directly or indirectly, with the Hickok offer at any time. The repeated use of the word "bank" is primarily to indicate the situs of the many meetings and conferences which were had on the premises of its Salem branch with reference to the offer. Mr. Hickok, the manager of that branch, appears at all times to have been acting solely as an agent for Capital Properties, Inc. Neither appellants nor the respondent makes any representations to the contrary.

■ We come unavoidably upon a situation which strongly suggests to us the necessity for amplifying the accounting in the lower court beyond the scope of

the prayer of plaintiffs' complaint. It will be recalled that plaintiffs alleged the existence of a partnership between them and defendant and that this was denied. We have found that there was a partnership. The record indicates that no accounting has ever been had between the parties growing out of their relations between August 10, 1946, and November 2, 1946. The importance of a final accounting between them is emphasized by plaintiffs' Exhibit No. 2, which is a letter under date of October 9, 1946, signed by Janicek as a partner and addressed to a San Francisco mercantile house. It enclosed a financial statement of the Salem Company as of August 25, 1946. This financial statement shows a net worth close to $60,000.00 as of that date and is signed by all the parties to this suit. This exhibit was offered as a part of plaintiffs' proof that Janicek was in fact one of their copartners at the times indicated. Whether or not the parties have made a satisfactory accounting between themselves or have in some way barred themselves from asserting a right to an accounting, we do not undertake to say from the record now before us. We feel, however, that it would be inequitable for a court to compel an accounting between defendant and plaintiffs as to defendant's interest in the Cascade Company and at the same time suffer the plaintiffs to retain the avails of the liquidation of the Salem Company, if any were realized as the result of its operations during the period from August 10, 1946, to November 2, 1946. Under the circumstances, we are of the opinion that the lower court should accord the parties hereto—if they so desire— an opportunity to amend their respective pleadings herein so as to encompass by appropriate allegations what they conceive to be their respective rights with reference to an accounting between them growing out

of their operations of the Salem Company during the period beginning August 10, 1946, and ending November 2, 1946. Such amendments, if made, shall, of course, be subject to such terms as the lower court in its discretion may deem proper. This privilege to amend is predicated upon the familiar rule that where equity takes jurisdiction for one purpose, it will retain it to do complete justice between the parties. *Public Market Co. of Portland v. City of Portland,* 171 Or. 522, 595, 130 P. (2d) 624, 138 P. (2d) 916; *Nelson v. Smith,* 157 Or. 292, 321, 69 P. (2d) 1072; *American Surety Co. of New York v. Hattrem,* 138 Or. 358, 364, 3 P. (2d) 1109, 6 P. (2d) 1087.

The decree of the lower court is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

BRAND, A. C. J., concurring in the result.

I agree that the majority opinion demonstrates that the defendant, before November 2, 1946, was guilty of a breach of his obligation of fidelity to the plaintiffs with whom he stood in the position of a partner. During that time he entered into negotiations for his own private advancement in a matter in which the partnership was interested, and failed to make disclosures of his activities to his partners. I also agree that the scope of inquiry upon remand of the case for further proceedings should be enlarged, if either party desires it, for an accounting concerning the dealings of the partnership during the period in which the defendant was a member thereof. I am content that the matter should be remanded to the circuit court for an attempted accounting, but I have grave doubts as to whether a satisfactory and legal basis of an accounting can be found in a case where, as here, the breach of fiduciary

duty by the defendant consisted in the fact that during a period of one month he withheld information from his partners and negotiated for his own benefit with third parties, and then withdrew from the partnership and entered into some agreement for financing with the third parties.

The case which is presented here differs materially from one in which a partner purchases for his own benefit a piece of land or other property, the opportunity to purchase which, belonged to his partnership. In the case at bar, the opportunity was for a business arrangement whereby third parties were to furnish finances, but under what terms and conditions, and for how long a period of time, appears to be uncertain. By concurring in the result reached by the majority, I do not wish to be understood as agreeing in advance that a satisfactory legal basis for an accounting subsequent to November 2, 1946, can be found by the trial judge. The briefs which have been submitted are devoted almost exclusively to establishing the breach of fiduciary obligation. The difficulties which will confront the trial judge in an accounting were not, and perhaps could not be considered at this time. Therefore, notwithstanding my doubts as to the possibility of a satisfactory accounting, I concur in the decision that the attempt should be made.