16722

WYMAN v. DAVIS *ET AL.*

(74 S. E. (2d) 694)

*Mr. John K. deLoach,* of Camden, *for appellants,*

*Messrs. Murchison & West,* of Camden, *for Respondent,*

February 27, 1953.

STUKES, Justice.

The main question in this case is whether there was a partnership between the parties. The action was for partnership accounting and the defendants, who are now appellants, denied the existence of the relation with

plaintiff, now respondent, and contended that he was their employee. The case was treated and tried, as to all issues, as in equity, and there were concurrent findings of fact by the master and the trial judge which were favorable to respondent whereby he recovered judgment against appellants for $1,663.64. These concurrent findings cannot, of course, be reversed if there was evidence to support them and if they are not, in our view, contrary to the clear preponderance of the evidence. 3 S. C. Dig. 560 *et seq.,* Appeal and Error, § 1022(2) and 1022(3).

The case appears to be the first to reach this court which is governed by the Uniform Partnership Act, 5 Code of 1952, page 294, secs. 52-1 *et seq.;* the relation which existed between the parties was formed after the passage of the Act in 1950. It contains in sec. 52-11 the definition that a partnership is, quoting, "an association of two or more persons to carry on as co-owners a business for profit." The succeeding section elaborates by reciting various relations which do not constitute partnership. Consideration of the prior decisions of this court establishes that the Uniform Act has not changed our preexisting law on this phase of the subject, which is applicable to the facts of the case in hand. A partnership agreement may rest in parol. *Course v. Prince,* 1 Mill Const. 413; *State v. Grumbles,* 100 S. C. 238, 84 S. E. 783. The agreement may be implied and without express intention. *Stephens v. Stephens,* 213 S. C. 525, 50 S. E. (2d) 577; *Trexler v. McIntrye,* 216 S. C. 469, 58 S. E. (2d) 887. Perhaps our most enlightening single case in point is *Price v. Middleton,* 75 S. C. 105, 55 S. E. 156.

The March 1951 issue, volume 3, No. 3, of the South Carolina Law Quarterly contains Part I of an exhaustive and valuable article on the subject by Professor Coleman Karesh. At pages 222 *et seq.,* he treats the immediate question under the section heading, "Rules for Determining the Existence of a Partnership." Citations of our relevant decisions are contained in the footnotes, to which there need

be no further reference. Each is necessarily governed by its own facts and we turn to those presented in this case.

Respondent was formerly appellants' competitor in the printing business in Camden and a corporation which he headed, Camden Bulletin, Inc., owned modern equipment including an offset press, with the operation of which appellants were not even familiar. It produced more rapidly and economically than the machinery of the appellants. They, as partners, formerly operated under the name of Arrow Printing Company. The major part of respondent's equipment was subject to a purchase money mortgage given by his corporation, upon which a considerable balance was due. Apparently the leading partner of the appellants' former firm was Davis who was regularly employed as a linotype operator by a Columbia daily newspaper. He commuted from Camden to that employment and had only his spare time to devote to the Camden business. The other male partner, Bailey, was a Camden postoffice employee and seems to have had little remaining time to work in the printing business. The wives of Davis and Bailey both mothers of young children, also worked occasionally in the business, as did respondent's wife, and Mrs. Bailey was the bookkeeper, all without salaries.

Respondent testified to several preliminary conferences with Davis and with Bailey in which partnership was discussed, and also a corporation, by which respondent, as salesman, would be paid for his full time twenty per cent of the gross sales of printing. Bailey was quoted as saying at a conference in which he participated, that he and Davis were putting up $500.00 each as operating capital and that respondent would be given time and opportunity to earn his equal contribution of $500.00 by which he would be the owner of one-third of the business and meanwhile he would be paid, quoting from his testimony, "adequate money to live on, whether they (Davis and Bailey) took anything from the business or not for a period of one year." Following their agreement respondent, for his former corporation,

executed a bill of sale to Arrow Printing Company, the former partnership of Davis, Bailey and their wives, of his mortgaged equipment, subject to the indebtedness which was assumed. Davis and Bailey then borrowed from the bank sufficient to pay off the latter and the business paid in installments to the bank.

The new business, which was called by the agreement of the parties Economy Printing Company, went forward and respondent was paid, first $50.00 a week, which he called a "drawing account," then $60.00, later $65.00, and finally $75.00. None of the others was paid anything except Mrs. Davis and Mrs. Bailey who were paid $25.00 each (at Christmas) during the whole period of about nine months from the beginning of the business until this action was commenced. Meanwhile there was friction and repeated futile efforts to reduce to writing the agreement between the parties. An attorney was engaged and he prepared more than one proposed agreement but upon objection of one or more of the parties, none of the written agreements was executed. After this the attorney was instructed to procure the incorporation of the business and a charter was actually obtained and the respondent was elected president of the corporation, but upon meeting in the attorney's office to adopt corporate by-laws, differences again arose and the corporation was mutually abandoned.

The recorded charter was introduced in evidence. It recites that respondent, Mrs. Davis and Mrs. Bailey were corporators, that respondent was elected president at the organizational meeting, Mrs. Davis vice president and Mrs. Bailey secretary and treasurer. The stated capital was $5,000-.00, consisting of fifty shares of the par value of $100.00, but Davis testified that only forty-eight shares were to be issued in order to be divisible into equal thirds. The stock was never issued.

Copy of an audit, which was made about six months after the beginning of Economy Printing Company, showed a

net profit to that time (after the weekly payments to respondent) of $2,065.93, and accompanying inventory is of equipment, quoting, "acquired by Bailey and Davis," of the value of $2,661.65; and "acquired by Wyman", $2,783.07, less $1,600.00 indebtedness to bank, resulting in, quoting, "estimated Wyman equity", $1,183.07. There was another, subsequent audit report, designated "Profit and Loss Statement", by a different accountant, which showed a net loss from April to December, 1950 of $222.69. The explanation in evidence is that the difference in statements was occasioned by the fact that the last was made for tax purposes.

It is reasonably inferable from the evidence that the differences and disagreements among the parties, who we are constrained by the record to agree were partners, arose from the fact that it was the original understanding that respondent was to devote his full time to sales and that he promptly secured more business than the others could turn out, whereby he was forced to devote long hours to work in the shop in order to fill the orders which he was able to obtain. For this respondent claimed extra compensation and that his right to it was conceded in part, at least, by the others is indicated by the admitted plan to issue to him six shares of stock in the proposed corporation without other consideration. That he was elected president of it is practically conclusive that he was more than merely an employee, as appellants nevertheless contend. With respect to the management of the business, respondent testified as follows:

"Q. While you were in with these people, who ran the business, who made the decisions, who bought the materials? A. Mr. Davis did most of the buying. His job took him to Columbia and he did all the buying of the paper and stuff used.

"Q. Did you ever have occasion to do any buying at all? A. Yes, I took over when Mr. Davis was not there.

"Q. Did you consult him before you bought things? A. No, we ran the business more or less together.

"Q. Did you feel free to make any routine decisions without consulting Mr. Davis? A. I made every decision if he was not there. We made the decisions together.

"Q. As far as the management went, you shared it equally? A. Yes, we had to because I was the only one there to do it.

"Q. Did he ever object or complain? A. No.

"Q. You entered into various agreements (sic) you did business with, did you not? A. Yes.

"Q. You gave deadlines when materials would be delivered, when publishing would be done, etc.? A. Yes. I would consult Mr. Davis if it was in his department. We worked pretty well together.

"Q. You did enter contracts on behalf of Economy Printing Company, did you not? A. Yes. My main job was selling and pricing goods sold."

And in reference to his contribution to capital, he said:

"Q. With regard to your Bill of Sale, in stating the consideration it says 'the assumption of Mortgage indebtedness.' Were you paid anything for that? A. No. It was the understanding that I would have an equal share of stock in the new business for my equity in that equipment."

Before commencement of Economy Printing Company respondent had in his employ two apprentice printers whom he took with him to work for stated wages in the new business; beside him, they alone worked full time. Disinterested in the outcome of the litigation, they both testified; one, in part, as follows:

"Q. Did you hear any conversation between Mr. Wyman and Mr. Davis and Mr. Bailey prior to, or immediately following, the beginning of their business relationship about a year ago? A. Yes.

"Q. What did you hear? A. I heard Mr. Davis and Mr. Bailey tell Mr. Wyman that he would be well taken care of when they went into business together, whether they made anything the first year or not.

\* \* \*

"Q. Who did the most of the work down there? A. Mr. Wyman managed the business.

"Q. Did he take orders from Mr. Davis? A. They more or less worked together.

"Q. Who did you go to for instructions when you needed instructions? A. That was according to what I was doing and what I needed to know. I went to both."

And the other, as follows:

"Q. Did you hear any conversation between Mr. Davis and Mr. Bailey and Mr. Wyman regarding any arrangement which they made about going into the business of the Economy Printing Company? A. Yes, I heard some.

"Q. Tell us when and what you heard, as well as you remember? A. It was about the time they went in together. I heard them talking together that they wanted to form a partnership, Mr. Wyman, Mr. Davis and Mr. Bailey.

"Q. You heard that? A. Mr. Davis was talking to Mr. Wyman.

"Q. Mr. Davis suggested forming a partnership consisting of Mr. Davis, Mr. Bailey and Mr. Wyman? A. Yes.

"Q. What statement did you hear of the arrangements, what were the terms of the partnership, if you heard? A. Each were going to put up five hundred ($500.00) dollars.

"Q. Each of the three? A. Mr. Davis and Mr. Bailey were and Mr. Wyman, as soon as he was able.

"Q. Was there any discussion about Mr. Wyman not being able to do it at the time? A. Just that he didn't have too much money then.

"Q. How about the equipment? Was there any discussion about the equipment you had been working on? A. They were going to put all the equipment together.

"Q. What was Mr. Wyman to do with the equipment he had? A. They were going to put the equipment together.

"Q. Now, that was in addition to Mr. Davis and Mr. Bailey putting up five hundred ($500.00) dollars and Mr. Wyman, when he had it? A. Yes.

.* * *

"Q. Did you hear Mr. Wyman say anything to Mr. Davis regarding this mechanical work and any possible compensation for such work? A. I heard Mr. Wyman say he thought he should get something for the mechanical work and that it should go for his share in the business.

"Q. What did Mr. Davis say to that? A. He agreed with him.

\* \* \*

"Q. Who did you consider to be the manager of the business? A. Well, they both were managers, as far as I was concerned.

"Q. Both Mr. Davis and Mr. Wyman were managers as far as you were concerned? A. Yes.

"Q. Who did you take most of your orders from? A. From Mr. Wyman."

Davis' explanation of the reason for the rupture in relations is in the following brief excerpt from his testimony:

"Q. I believe Mr. Wyman was listed on the Charter, and I believe you testified that he was elected President of the corporation. If he were just an employee, isn't it strange that he would be elected as President? A. I don't guess so, we had a lot of confidence in him.

"Q. You found him to be an excellent person, did you not? A. He showed signs of being very dependable, up until the members decided he would not be general manager, and he left.

"Q. Who was to be general manager? A. My wife.

"Q. She was to be the boss? A. Yes.

"Q. And that was when Mr. Wyman stated he would not go along any further? A. Yes."

He admitted on cross-examination that the business more than doubled after respondent's entry into it and the obtention by the latter of large orders from the du Pont Corporation; and that the business declined after respondent's connection with it ended.

To the conflicting evidence, which has here been summarized only in part, the master and court applied, we think with accuracy, the following tests of partnership derived from the decided cases: (1) Sharing of profits and losses; (2) community of interest in capital or property; and (3) community of interest in control and management. The report of the master and the decree of the trial court bear the earmarks of careful consideration and full understanding of the applicable legal principles.

What has been said disposes of appellants' first question adversely to them. It was based on the first exception by which it is contended that respondent was not a partner, but only an employee. In their brief appellants pose a second question—whether respondent was entitled to judgment against appellants in the particular amount rendered. Their contention is that the judgment should have been for $1,263.64 or $1,171.21. But the argument is not responsive to the exceptions to the judgment. There were only two and the first related to the main fact of whether respondent was a partner, and the second and only exception contends that no money judgment at all should have been rendered. Therefore, the second question that is attempted to be made in argument was not raised by the exceptions which are before us. The same was true with reference to the exceptions to the master's report so that the trial court did not pass upon the precise question which is sought to be made for the first time in the brief here. For that reason it is unavailable to appellants. If it were, it could not be sustained in view of the concurrent controlling findings thereabout of the master and court. The amount found appears to have been carefully and conservatively reached; certainly it is not against the clear preponderance of the evidence, which would be necessary for reversal or modification.

The exceptions are overruled and the judgment affirmed.

BAKER, C. J., and FISHBURNE, TAYLOR and OXNER, JJ., concur.