1401

Allen BECK, Appellant v. Sheelah CLARKSON, Respondent.
(387 S. E. (2d), 681)

Court of Appeals

*William L. Dodson, Jr.,* of the *Bowen Law Firm,* Greenville, *for appellant.*

*T. Emmet Walsh* and *William E. Walsh,* of *Gaines & Walsh,* Spartanburg, *for respondent.*

Heard Sept. 13, 1989.

Decided Oct. 30, 1989.

GARDNER, Judge:

Plaintiff Allen Beck (Beck) brought this action against defendant Sheelah Clarkson (Clarkson) alleging (1) a cause of action for breach of a partner's fiduciary duty, (2) a second cause of action based upon Section 33-41-540, Code of Laws of South Carolina (1976, as amended) in which he

alleged that Clarkson must account to the appellant for all profits derived by her from the Spring City venture and hold such profits in trust for the appellant, and (3) for breach of the partnership agreement and wrongful dissolution. When the case was called for trial and at the close of Beck's case in chief, the trial judge granted a directed verdict on the grounds that Beck failed to prove damages to a reasonable certainty. We reverse and remand.

## ISSUES

Beck asserts that the trial judge erred in granting the directed verdict.

By additional sustaining grounds, Clarkson argues (1) that Beck failed to offer sufficient evidence to establish the existence of the partnership and (2) assuming there was evidence of a partnership, it was a partnership at will which was terminated before acquiring assets or transacting business.

## FACTS

The facts, considered in a light most favorable to Beck, are that Beck, in January 1985, entered into an agreement with defendant Clarkson and a third party, Gerrye Clegg, to form a partnership, known as C.B.C. Investments. The name "C.B.C. Investments" was derived from the first letter of each partner's name. The partnership was formed for the purpose of building and developing a warehouse facility in Cherokee County, South Carolina, and leasing the warehouse to Spring City Knitting Co. (Spring City) a division of Cluett, Peabody Company (Cluett).

The partners of C.B.C. Investments began researching the information necessary to develop the warehouse. Beck's wife, a real estate broker, assisted in the research. Clarkson submitted, on behalf of C.R.C. Investments, on March 18, 1985, a proposal, including a proposed lease to Cluett. Cluett expressed interest in the C.B.C. proposal but expressed uncertainty as to what size building they would require.

Over a number of months, Clarkson continued to negotiate with Cluett on behalf of C.B.C. Investments. As evidence of the continued negotiations, Clarkson mailed a second proposal for the warehouse facility to Beck on June 19, 1985.

Around July 1, 1985, Clarkson, at her father's direction, withdrew from C.B.C.; she told Beck that the project would be developed for the benefit of her and her sister and not C.B.C. Clarkson assured her father that she would proceed solely at his direction and she thereafter, excluding Beck, proceeded with the negotiations with Cluett and Spring City. On or about June, 27, 1985, Clarkson sent further proposals to Cluett, but this time on behalf of herself and her brothers and sisters. These proposals included the original C.B.C. Investment proposal for the 60,000 square foot building, a proposal similar to that mailed to Beck on June 19, for 150,000 square foot building, and an additional proposal for a 90,000 square foot building.

On September 30, 1985, Clarkson acting on behalf of herself and her brothers and sisters, with whom she was now in a partnership known as "Clarkson Associates," entered into a contract to purchase the land for the warehouse facility to be leased to Spring City. The contract called for a total purchase price of $80,000.00. On October 29, 1985, Cluett finalized their specification requirements in a letter to Clarkson; the purchase of the property for the facility was then completed by deed on November 8, 1985.

On December 23, 1985, Clarkson, her brothers and sisters entered into a written partnership agreement; subsequently another party, John C. Anderson, came into the partnership with a 50 percent interest.

On January 20, 1986, Clarkson Associates entered into a lease agreement with Spring City by which Spring City agreed to pay $25,800.00 as monthly rent. The record reflects that subsequently the warehouse was built by Clarkson Associates at a cost of $1,879,578.90. The record reflects that Clarkson Associates on July 1, 1987, mortgaged the property to the South Carolina National Bank for $1,712.244.16. There is evidence of record that Beck was in a position to pay his part of the difference between the actual cost of the purchase of the land and the construction of the building and the amount received from the mortgage. The mortgage called for monthly payments of $22,000.00 which left a $3,800.00 per month cash flow since Spring City had agreed to pay all taxes and insurance on the property. There is expert testimony to the effect that the equity of Clarkson

Associates partnership in the facility as of the time of the trial was $1,870,700.00. The expert testified that at the end of the 5-year period, Clarkson Associates' equity in the warehouse facility would be $2,859,453.00.

The case was called for jury trial at the March 1988 term of the Spartanburg County Court of Common Pleas. At the conclusion of Beck's case the defendant moved for a directed verdict on the grounds that (1) Beck had failed to prove that a partnership existed, (2) that if the partnership existed, it was a partnership at will terminable by either party and without liability for damages and that such partnership was terminated prior to the ownership of any property or any business being conducted and (3) that the plaintiff failed to prove any damages. The trial judge granted a directed verdict as to all of the causes of action alleged by Beck on the grounds that Beck had failed to prove damages by a reasonable certainty.

## DISCUSSION
### I.

When a party makes a motion for a directed verdict, under previous practice or for an involuntary non-suit, it is incumbent upon the trial judge, and this court on appeal, to view the evidence and all inferences arising therefrom in the light most favorable to the plaintiff. If there is more than one reasonable inference which may be drawn from the plaintiff's evidence, one of which could support a verdict for the plaintiff, then a motion for a directed verdict or non-suit should be denied. *Riddle v. Pitts*, 283 S. C. 387, 324 S. E. (2d) 59 (1984).

Before ruling on Clarkson's motion for directed verdict, the trial judge observed that Beck's evidence as to damages was in the nature of an expectancy and was therefore too speculative and uncertain to allow the case to go to the jury. The trial judge obviously based his opinion to the effect that lost profits from a new business are per se nonrecoverable. This was established in the case of *Standard Supply Co. v. Carter & Harris*, 81 S. C. 181, 62 S. E. 150 (1907) and was the law of this state for many years. Recently, the Supreme Court has abandoned this rule in favor of the modern view that the new business issue is to be considered as a matter of

evidentiary sufficiency rather than an automatic bar to recovery. *See John D. Hollingsworth on Wheels, Inc. v. Arkon Corporation,* 279 S. C. 183, 305 S. E. (2d) 71 (1983); *Bryson v. Arcadian Shores, Inc.,* 273 S. C. 471, 257 S. E. (2d) 233 (1979).

The Supreme Court removed all doubt as to the proper rule on this issue in the recent case of *Drews Company, Inc. v. Ledwith-Wolfe Associates, Inc.,* 296 S. C. 207, 371 S. E. (2d) 532 (1988). Therein the court states "we believe South Carolina should now unequivocally join those jurisdictions applying the new business rule as a rule of evidentiary sufficiency and not as an automatic preclusion to recovery of lost profits by a new business or enterprise." In *Drews Company,* the court applied the same standards for judging lost profits of a new business as those applied to lost profits in other cases, and set forth three requirements. First, the profits must have been prevented or lost as a natural consequence of the breach of contract; second, lost profits must reasonably be supposed to have been within the contemplation of the parties at the time the contract was made as a probable result of a breach of the contract, and finally, the lost profits must be established with reasonable certainty, and not be conjectural or speculative.

A definition of reasonable certainty is contained in the case of *South Carolina Finance Corporation of Anderson v. West Side Finance Company,* 236 S. C. 109, 122-123, 113 S. E. (2d) 329, 336 (1960); we quote:

> To warrant such recovery, loss of profits must be established with reasonable certainty, for recovery cannot be had for profits that are conjectural or speculative. But it must be borne in mind that since profits are prospective they must to some extent, be uncertain and problematical, and so, on that account or on account of the difficulties in the way of proof, a person complaining of breach of contract cannot be deprived of all remedy, and uncertainty merely as to the amount of profits that would have been made does not prevent a recovery. The law does not require absolute certainty of data upon which lost profits are to be estimated, but all that is required is such reasonable certainty that damages may not be based wholly upon speculation and conjecture,

and it is sufficient if there is a certain standard or fixed method by which profits sought to be recovered may be estimated and determined with a fair degree of accuracy.

The following from 59A Am. Jur. (2d) *Partnership* Section 566 (1987) is pertinent to this issue; we quote:

### Section 566. Generally; future profits

In case of a breach of the partnership contract by wrongful dissolution, the damages recoverable include the value of the profits which the plaintiff otherwise would have received, or the value to him of the continuance of the agreement during the term provided by contract, meaning the prospective or anticipated profits of the partnership, or the profits that would have accrued to the injured partner had the partnership not been wrongfully dissolved. Thus, the loss of future profits is a proper measure of a part of the damages for wrongful dissolution, particularly where the sole object of the business in question is the accumulation of profits.

In the case of a partner wrongfully excluded from the business, resulting in a dissolution of the partnership as to him, his entitlement is to his share of the profits on the completion of the venture. . . .

Applying the above rule to the case at hand, we find a situation in which there is testimony that the value of the property involved in this case at the time of trial was $3,500,000.00 and that the cost of acquiring it was $1,955,789.00,[1] resulting in an immediate acquisition of equity in the amount of $1,544,211.00. There is evidence of record that this equity will grow as the mortgage is reduced.

For the above reasons, we hold that the trial judge ■ erred in failing to apply the evidentiary view of the new business rule because there is evidence of record that (1) large profits were lost by Beck as a natural consequence of the breach of contract, (2) there is evidence of

---

[1] This figure reflects the cost to build the facility $1,875,789.00 plus the cost to acquire the property $80,000.

record that the lost profits could reasonably be supposed to have been within the contemplation of the parties at the inception of the partnership contract as a probable result of the breach of the partnership agreement and (3) there is evidence of record that lost profits have been established with reasonable certainty, without conjecture or speculation. And we so hold. The order directing a verdict for Clarkson was erroneously made because there is evidence of record as indicated which required the submission of damages to the jury. And we so hold.

## II.

With reference to whether there is evidence of record that the parties entered into a contract to form a partnership, Beck testified that Clarkson approached him about forming a partnership with Gerrye Clegg to construct a warehouse and lease it to Spring City. Beck testified that they agreed to "share the profits or losses," He acknowledged that they never reduced the partnership agreement to writing but testified that the parties looked at potential building sites and inquired into certain properties. Beck's wife procured plats and contacted owners of all properties surrounding Spring City's plant. Then the parties procured building proposals from several contractors and discussed financing.

Beck's wife, Deborah, testified that upon request, she helped in the search for a suitable building site and gave information to Clarkson; she testified further that Clarkson told her that Beck, Clarkson and Clegg were one-third partners. Mrs. Beck also testified that she saw certain documents with the letterhead "C.B.C. Investments" which Clarkson told her meant Clarkson, Beck and Clegg.

Beck published part of Clarkson's deposition as part of his case in chief. From this we find testimony that Clarkson met with Beck and Clegg about Spring City and that she and Beck looked at possible sites for the building and discussed financing and received a proposal from a contractor addressed to C.B.C. Investments. Clarkson also testified that she sent the proposal to Spring City purportedly from C.B.C. Investments. Moreover, Clarkson referred to C.B.C. Investments as "my investment group" in a letter to Spring City.

Numerous exhibits were offered by Beck including a

March 1985 proposal sent by Clarkson to Spring City's parent corporation, Cluett, Peabody and signed it "Sheelah Clarkson, C.B.C. Investments." This proposal listed Clegg, Beck and Clarkson underneath C.B.C. Investments. Also introduced was a lease describing C.B.C. Investments, a partnership as landlord which was forwarded with the proposal to Spring City.

A partnership is an association of two or more persons to carry on as co-owners a business for profit. Section 33-41-210, Code of Laws of South Carolina (1976).

A partnership agreement may rest in parol. The agreement may even be implied and without express intention. *Wyman v. Davis*, 223 S. C. 172, 74 S. E. (2d) 694 (1953); *Buffkin v. Strickland*, 280 S. C. 343, 312 S. E. (2d) 579 (Ct. App. 1984).

If the alleged partners intend to and do enter into such a contract as in the eyes of the law constitutes a partnership they thereby become partners whether they are designated as such or not in the contract. *Stephens v. Stephens*, 213 S. C. 525, 50 S. E. (2d) 577 (1948). *Id.* 50 S. E. (2d) at 579. Quoting 47 C. J. 640 that "while it is difficult, and it has been said to be impossible, to formulate an exact and precise definition of a partnership, none seems more accurate and comprehensive than that of Chancellor Kent, as follows: 'A contract of one or more competent persons to place their money, effects, labor and skill or some or all of them, in lawful commerce or business, and to divide the profits and share the loss, in certain proportions.' "

*Stephens* discusses in detail the formation of a partnership and the elements to be considered in determining whether a partnership existed. We suggest that the reader carefully study *Stephens* since we believe it to be the landmark case setting forth the criteria to determine whether a partnership agreement has been entered into.

We hold that there is evidence of record of a formation of a partnership between Beck, Clarkson and Clegg and that this partnership was known as C.B.C. Investments. We therefore hold that the trial judge did not err in holding that there was sufficient evidence to go to the jury on the question of whether Beck had proved the existence of a partnership. And we so hold.

## III.

In the case of *McPherson v. J. E. Sirrine & Co.*, 206 S. C. 183, 33 S. E. (2d) 501 (1945), it was held that where a partnership agreement does not fix any definite time for termination of the partnership status, but leaves such time to be governed by contingencies, such as ouster of one partner by a copartner's vote, the partnership is for all practical purposes a partnership at will, subject to dissolution by the act of one or more partners at any time.

Taking the *McPherson* rule at face value and on first blush, it would seem that C.B.C. Investments is a partnership at will. We, however, do not believe that the Supreme Court intended to define so narrowly the circumstances creating a partnership at will. In 59A Am. Jur. (2d) *Partnership* Section 819 (1987), it is stated:

> [I]f a partnership is one at will, without any definite term *or definite undertaking to be accomplished*, a dissolution by the election of one party is not a breach of contract, so that the terminating party incurs no liability, whatever the motive for the termination may have been, and whatever may be the injurious consequence to his copartners who have neglected to protect themselves by an agreement to continue for a definite term. [Emphasis added.]

In the partnership before us there was a definite undertaking to be accomplished, i.e., the negotiation and consummation of a lease contract with Spring City, and then the purchase of a property site, the construction of the building and the financing of its construction. Upon the completion of these steps, the parties intended simply to share the profits. Under these circumstances, the partnership contract between the parties envisioned a definite undertaking to be accomplished and the division of the profits therefrom; considered in this light, there was a definite term for the contract to be in existence. We hold that whether the partnership was one at will, under the circumstances of the case, is a question of fact for the jury because the very purposes of the partnership to build and lease to Spring City a warehouse by their very nature involved time limitations which were contingent only upon the decision of Spring City to do business with the corporation.

Moreover, Section 33-41-920, Code of Laws of South Carolina (1976), makes it clear that an act of dissolution does not terminate the partnership. It is equally clear that dissolution does not extinguish the partner's fiduciary duties owed one to the other. This principle is set forth in the description of the fiduciary duty found in Section 33-41-540(1), Code of Laws of South Carolina (1976), as follows:

> Every partner must account to the partnership for any benefit and hold as trustee for it any profits derived by him without the consent of the other partners from *any transaction connected with the formation, conduct or liquidation of the partnership or from any use by him of its property.* [Emphasis added.]

The view generally expressed is that the trust or fiduciary relation between partners and or their partnership, as to the firm business and assets, continues after dissolution. 68 C.J.S. *Partnerships* Section 354(b) (1950). This rule has been succinctly stated in other jurisdictions. In *Fouchek v. Janicek*, 190 Or. 251, 225 P. (2d) 783 (1950), one partner appropriated a business opportunity after the termination of his partnership, having negotiated for the opportunity on his own behalf while the partnership was also engaged in negotiations regarding the same opportunity. The partner set forth the same argument as Clarkson does in the case now before us, i.e., that he had no duty to his former partners after the partnership was at an end. In finding a breach of fiduciary duty, the court stated:

> *When a partner wrongfully snatches a seed of opportunity* from the granary of his firm, he cannot, thereafter, excuse himself from sharing with his co-partners the fruits of its planting, even though the harvest occurs after they have terminated their association. [Emphasis added.]

We are also impressed by the following language from *Leff v. Gunter*, 33 Cal. 3rd 508, 189 Cal. Rptr. 377, 658 P. (2d) 740 (1983), in which the appellate court approved the trial court's instruction on this issue and stated:

The instructions advise the jury that a partner's duty not to compete with his partnership with respect to a partnership opportunity which is actively being pursued by the partnership survives his withdrawal therefrom. Defendants have cited no contrary authority. Nor do Defendants assert any persuasive reason in logic or principle which relieves a partner from such continuing duty. *There is an obvious and essential unfairness in one partner's attempted exploitation of a partnership opportunity for his own personal benefit and to the resulting detriment of his co-partners.* It may be assumed, although perhaps not always easily proven, that such competition with ones own partnership is greatly facilitated by access to relevant information available only to partners. Moreover, it is equally obvious that a formal disassociation of oneself from a partnership does not change this situation unless the interested parties specifically agree otherwise. It is no less a violation of the trust imposed upon partners to permit the personal exploitation of that partnership information and opportunity to the prejudice of ones former associates by the simple expedient of withdrawal from the partnership. 189 Cal. Rptr. at 381, 658 P. (2d) at 744. [Emphasis ours.]

The basis for a suit for an accounting under Section 33-41-540(1) is in reality almost identical, though separate causes of action are actually stated, with the causes of action for breach of trust and breach of contract.

In the statutory action there must be an accounting of any profits obtained by Clarkson from any transaction connected with the formation, etc., of C.B.C. Investments. Clearly, this embraces "a seed of opportunity" created by the idea of negotiating the lease agreement with Spring City and all the intended incidences thereof. And we so hold.

For the same reason, we hold that there is evidence of record that Clarkson appropriated the same "seed of opportunity" in violation of her fiduciary duty to Beck and the other partner in so doing. And we so hold.

Likewise, the jury might well find that Clarkson's withdrawal constituted a breach of contract by wrongful dissolution, the damages of which would include the appropriation of the seed of opportunity herein mentioned. See the quoted

section of Am. Jur. (2d) under discussion herein of damages.

We therefore hold that the trial judge erred in holding the partnership was a partnership at will. For the reasons stated, the question of whether the partnership was a partnership at will was a question for the jury to determine and not one of law. We hold there is evidence of record to justify sending this issue to the jury under the theories above enumerated. And we so hold.

## CONCLUSION

For the reasons stated, we hold that there is evidence of record (1) that Beck offered sufficient evidence during his case in chief to require that the case be submitted to the jury on the question of damages, (2) that Beck did offer sufficient evidence on the establishment of a partnership to require that this issue be submitted to the jury and (3) that there is no merit to Clarkson's contention that because the partnership was a partnership at will, there is no liability on her part. Accordingly, the order directing a verdict for Clarkson is hereby reversed and the case is remanded for a trial *de novo*.

Reversed and remanded.

SANDERS, C. J., and GOOLSBY, J., concur.

