**WESTERN PUBLISHING COMPANY, INC., Plaintiff,**

v.

**MINDGAMES, INC., Defendant.**

**MINDGAMES, INC., Plaintiff,**

v.

**WESTERN PUBLISHING COMPANY, INC., Defendant.**

**No. 94–C–552, 94–C–998.**

United States District Court, E.D. Wisconsin.

Feb. 25, 1998.

---

Richard A. Saldinger, Wendi Sloane, Barack, Ferrazzano, Kirschbaum & Perlman, Chicago, IL, Joshua L. Gimbel, Michael, Best & Friedrich, Milwaukee, WI, for Plaintiff.

E. Campion Kersten, Kersten & McKinnon, Milwaukee, WI, for Defendant.

## DECISION AND ORDER

ADELMAN, District Judge.

This consolidated case currently is set to begin trial on March 9, 1998. Before we get to trial, however, a partial summary judgment motion brought by Western Publishing Company, Inc. must be addressed.

## I. FACTUAL BACKGROUND

### A. General Background and Case History

In March 1988, G. Lawrence Blackwell III formed MindGames, Inc. to promote and sell a new board game he had created called *Clever Endeavor*. *Clever Endeavor* was MindGames's first and only product. Blackwell believed the game would reach the popularity of games like *Pictionary* and *Trivial Pursuit*. After selling 30,000 copies of the game in 1989, MindGames entered into a licensing agreement with Western and The Games Gang, Inc., under the terms of which Western and Games Gang planned to market, manufacture, promote, distribute and sell *Clever Endeavor*. Pursuant to the li-

censing agreement MindGames would receive royalties for the number of games sold and Western and Games Gang would provide a minimum amount of advertising support to the game. By its terms, the contract was governed by Arkansas law. Western has since assumed Games Gang's duties and obligations under the license and the agreement was amended to recognize that fact.

Net sales of *Clever Endeavor* in 1990, the first year of the agreement, totaled 165,000, but fell off dramatically starting in 1991. The parties amended the licensing agreement by allowing Western to reduce the percentage of gross sales to be used for advertising and promotion in order to keep the cost of the game down. In late 1993 Western drastically reduced prices to eliminate excess stock of the game. In 1994 Western made a bulk sale of its remaining stock of *Clever Endeavor*.

In May 1994 MindGames sued Western in federal court in the Eastern District of Arkansas for breach of the licensing agreement. MindGames sought $40 million in lost profits that it believed the game would have earned had it been marketed correctly, $1.2 million in "renewal fees" relating to the extension of the licensing arrangement past its original term, and other damages such as those related to the price of the bulk sale. Meanwhile, Western filed a declaratory judgment action in this district.[1] The Arkansas case was transferred to this district as well and the two cases were consolidated before District Judge Robert W. Warren.

In a Decision and Order of October 11, 1996, Judge Warren granted partial summary judgment in favor of Western on the issue of the lost profits, finding that (1) MindGames was a new business and (2) under Arkansas law the "new business rule" prevents new and unestablished business ventures from collecting lost profits as damages in breach of contract or tort cases. With Judge Warren's decision MindGames lost the vast portion of its desired relief.

When I became a district judge this case was randomly transferred to me as part of my initial case load. Now pending before me

is Western's second motion for partial summary judgment, which involves the last substantial chunk of damages—the renewal fees.

## B. *Undisputed Facts Relating to Renewal Fees*

Paragraph 2 (emphasis added) of the licensing agreement between the parties states as follows:

> The license grant shall become effective on the date this Agreement is fully-executed and continue in force until January 31, 1993. Provided that Licensees are not in breach of this Agreement, this license shall continue in force until January 31, 1994, *in the event the sum of at least $1,500,000.00 (whether earned or unearned) is paid* to Licensor by Licensees as a result of this Agreement prior to January 31, 1993. The license shall then automatically renew for successive one year periods provided that Licensees are not in breach of this Agreement and further *provided that Licensees have paid to Licensor at least the Renewal Amount during the preceding twelve (12) month period.* For each renewal term beginning on or after January 31, 1994, the Renewal Amount shall be $300,000.00, adjusted for the percentage of increase over the introductory gross sale price of $16.25 of the original version of "CLEVER ENDEAVOR" or its replacement. Any payment made to satisfy the Renewal Amount or the $1,500,000 referenced above shall be considered earned when paid and shall not be an advance payment for royalties to Licensor for the renewal term.

During the initial term of the licensing agreement (from March 30, 1990, through January 31, 1993), royalties paid to MindGames totaled approximately $600,000. As of January 31, 1993, Western had not been notified that it was in breach of any obligations under the license and accordingly had the right to renew the agreement. It let January 31, 1993, pass by, however, without paying MindGames the additional $900,000 required to satisfy the $1,500,000 automatic renewal amount. On February 1, 1993,

---

1. Western is incorporated in Wisconsin and has its principal place of business within this district. MindGames is incorporated and has its principal place of business in Arkansas. As the controversy involves in excess of $75,000, this court has diversity jurisdiction over the matter.

MindGames did not demand that Western pay the renewal amount in order to continue its licensing arrangement with MindGames. Nor did MindGames demand the return of its inventory from Western.

During a telephone conversation on or about February 4, 1993, Blackwell and Michael Letourneau, one of Western's marketing directors, agreed to meet at an upcoming trade show in New York City known as "Toy Fair" to discuss the status of the license and whether Western was going to distribute the game for another year. During the conversation, Blackwell expressed concern with Western's future commitment to *Clever Endeavor* and suggested to Letourneau that Western could ease his concern by guaranteeing a minimum royalty payment to Mind-Games regardless of the number of games sold in the future. Blackwell specifically proposed a minimum royalty payment for the upcoming year equal to roughly one-half of the royalties received by MindGames the previous year, or about $25,000 to $30,000.

With MindGames's knowledge and without MindGames's objection, Western continued to act as the exclusive licensee of *Clever Endeavor* for approximately two weeks until the mid-February start of Toy Fair. At Toy Fair, Blackwell and Letourneau discussed the status of the license and Western's future marketing plans for *Clever Endeavor*. Although whether an agreement was actually reached during Toy Fair is hotly disputed, it is undisputed that the two men at the least negotiated modifying the license to extend the term through January 31, 1994.

After Toy Fair, Blackwell, who is not an attorney, drafted an addendum to the licensing agreement dated March 5, 1993, and sent it to Western by cover letter dated April 9, 1993. The letter stated as follows:

This amendment dated 3/5/93 sets forth the following agreements:
1. Licensor and Western extend the term of the expiration of the licensing agreement to January 31, 1994.
2. Western agrees to pay $27,500 in minimum royalties to Licensor, one half to be paid by July 31, 1993, and the remainder to be paid by January 31, 1994. All of the $27,500 is considered an advance of royalties from Clever Endeavor product shipped between February 1, 1993 and January 31, 1994.
3. Western agrees to notify Licensor by December 31, 1993, of its desire to extend the licensing agreement one more year, or to have the licensing agreement expire on January 31, 1994.

All other provisions from the licensing agreement referenced in the first paragraph will remain in effect.

Blackwell's cover letter indicates that he merely "split the difference" between the $25,000 and $30,000 in minimum royalties that he and Letourneau had discussed.

Western did not sign the addendum for quite some time. Blackwell contacted Western in June 1993 to inquire about the addendum. Still, Western did not sign. Nevertheless, the parties continued their arrangement, with Western acting as the exclusive licensee and MindGames as licensor accepting royalty checks based on the number of games sold. In practice, therefore, they continued as if the agreement had not terminated.

Paragraph 27 of the license agreement, however, states as follows:

This is the entire Agreement among the parties, it supercedes all prior agreements, discussions and negotiations, and may not be changed, modified, or canceled except in writing signed by both parties.... No waiver either express or implied, by either party, of any provision or breach of this Agreement is effective unless in a signed writing, and no waiver will be deemed a waiver of any other or later or similar or dissimilar provision or breach....

January 31, 1994, came and went without Western paying MindGames anywhere near $300,000 in royalties or any payment to keep the agreement in effect for another year. The parties, however, continued their relationship as it stood until the February 1994 Toy Fair, at which point Blackwell and representatives of Western met at least twice to discuss the status of the license and whether Western was interested in continuing to market and distribute *Clever Endeavor*. At the meetings, Western indicated it wanted to "clean up" the prior year's extension matter

by signing an amendment, even though the time frame of that amendment had already passed.

At the conclusion of the meetings the parties failed to agree on a future licensing arrangement and Western terminated the business relationship. By letter dated February 28, 1994, Western discussed how it would proceed with disposing of its remaining inventory of the game. Also in that letter, Western indicated that its representative was signing the addendum Blackwell had prepared in regard to the one year extension. Western furthermore paid MindGames $11,-583.57, which Western asserts was the balance of the $27,500 minimum royalty fee for the February 1, 1993, through January 31, 1994, year.[2]

At no time during any discussions about extension of the licensing agreement did either party mention the $1.5 million or $300,-000 renewal payments. By letter dated February 25, 1994, MindGames, through counsel, claimed for the first time that Western owed MindGames both the balance of the $1.5 million renewal amount for the initial term of the agreement and a $300,000 renewal amount for the following one year term.

## II. APPLICABLE LAW

As is well known, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

The presence of a genuine issue of material fact is to be determined by the substantive law controlling that case or issue. *Kendrick v. East Delavan Baptist Church,* 886 F.Supp. 1465, 1471 (E.D.Wis.1995). In analyzing whether a question of fact exists, the court construes the evidence in the light most favorable to the party opposing the motion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Nevertheless, the mere existence of

some factual dispute does not defeat a summary judgment motion; "the requirement is that there is a *genuine* issue of *material* fact," *id.* 477 U.S. at 247–48, meaning that the factual dispute must be outcome-determinative under governing law, *Contreras v. City of Chicago,* 119 F.3d 1286, 1291 (7th Cir.1997). " '[F]acts not outcome-determinative under the applicable law, though in dispute, may still permit the entry of summary judgment.' " *Contreras,* 119 F.3d at 1292 (quoting *Wainwright Bank & Trust Co. v. Railroadmens Fed. Sav. & Loan Ass'n,* 806 F.2d 146, 149 (7th Cir.1986)). To defeat a properly supported motion for summary judgment, the opposing party must present specific and sufficient evidence that, if believed by a jury, would actually support a verdict in its favor. Fed.R.Civ.P. 56(e); *Anderson,* 477 U.S. at 249.

As to substantive law for this particular case, in a diversity jurisdiction lawsuit a federal court must apply the law of the state in which it sits. *Erie R. Co. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Doe v. Roe No. 1,* 52 F.3d 151, 154 (7th Cir.1995). Wisconsin law, however, permits parties to a contract to agree that the law of a particular jurisdiction will control their contractual relationship. *General Medical Corp. v. Kobs,* 179 Wis.2d 422, 428, 507 N.W.2d 381 (Ct.App.1993); *see Bush v. National School Studios, Inc.,* 139 Wis.2d 635, 642, 407 N.W.2d 883 (1987). Here, the parties agree that the contract by its terms is governed by Arkansas law.

Under Arkansas law, the first rule of contract interpretation is to give the language employed the meaning that the parties intended. *First Nat'l Bank v. Griffin,* 310 Ark. 164, 169, 832 S.W.2d 816, 819 (1992). The written agreement itself is the best evidence of the parties' intentions. *See id.* at 168, 832 S.W.2d at 818–19. It is the duty of the court to construe a contract according to its unambiguous language without enlarging or extending its terms. *North v. Philliber,* 269 Ark. 403, 406, 602 S.W.2d 643, 645 (1980). The initial determination of whether a con-

---

**2.** Whether this sum indeed satisfied the balance of the minimum royalty payment is contested by MindGames.

tract is ambiguous rests with the court, and when a contract is unambiguous its construction is a question of law for the court to decide. *Cate v. Irvin*, 44 Ark.App. 39, 44–45, 866 S.W.2d 423, 426 (1993). If there is any doubt about the meaning of the language there is an issue of fact to be litigated. *Id.* at 44, 866 S.W.2d at 426. However, the mere fact that the parties to a contract disagree on its interpretation does not render it ambiguous per se.

Further Arkansas law will be discussed as necessary.

### III. ANALYSIS

At issue are MindGames's claims that paragraph 2 of the licensing agreement obligates Western to pay MindGames (1) $900,-000 as a renewal amount ($1.5 million minus the $600,000 admittedly paid as royalties prior to January 31, 1993) because Western continued to act as exclusive licensee of *Clever Endeavor* from February 1, 1993, to January 31, 1994; and (2) $300,000 as a renewal amount because Western continued to act as exclusive licensee of *Clever Endeavor* from February 1, 1994, until it sold off its remaining stock of the game.

■ The parties focus most of their energy in this motion on whether the license agreement was indeed extended and, if so, how and when. In addition, Western argues that even if it were obligated at one time to pay the renewal amounts, MindGames either waived or now is estopped from recovery. The court, however, will focus first on the language of the agreement itself, as it is extremely important for present purposes. That language, together with the undisputed facts that Western did not pay MindGames a total of $1.5 million prior to January 31, 1993, nor a total sum of $300,000 during the February 1, 1993, through January 31, 1994, time period, is dispositive of this motion.

Although Paragraph 2 of the licensing agreement could have been better drafted, it is unambiguous. It states that the licensing agreement will automatically continue until January 31, 1994, if two conditions are met: first, Western cannot be in breach of the contract, and second, Western must have paid to MindGames from March 30, 1990 through January 31, 1993, a total of $1.5

million either in royalties or a combination of royalties and a lump sum renewal payment. Paragraph 2 then states that if extended until January 31, 1994, the licensing agreement will automatically renew after that date for one-year periods if two conditions are met: first, again, Western cannot be in breach of the contract, and second, Western must have paid to MindGames during the prior extension period (such as from February 1, 1993, through January 31, 1994) a total of $300,000 either in royalties or a combination of royalties and a lump sum renewal payment.

Paragraph 2 thus set up requirements that have a recognized name in contract law: conditions precedent. These conditions precedent appear to have been for Western's benefit. If Western, through royalties or otherwise, paid the renewal amount and if Western was not in breach, then MindGames automatically became obligated to continue the contract for another year on the same terms. If *Clever Endeavor* had been wildly successful, the $1.5 million or $300,000 amounts could have been met through royalties alone and Western would have continued its exclusive right to market and distribute the game; otherwise, payment of the shortfall was within Western's power alone. To some extent, MindGames recognizes that the renewal amounts were conditions precedent, as it concedes that

> [Western] could have walked away from the contract at the close of business on January 31, 1993 and have been liable only for royalties on actual sales up to that date.

Memorandum in Opposition (Dec. 16, 1997) at 23.

In regard to the present motion, MindGames argues that paragraph 2 imposed a duty on Western to pay renewal fees. This argument, however, rests on a misreading of the language of the contract. Western could have paid the renewal fees if it wanted the contract to automatically renew. Indeed, payment of these fees was a condition upon which automatic renewal depended. But at no time did paragraph 2 ever *require* or *oblige* Western to pay these fees. Paragraph 2 provides that the license shall con-

tinue in force until January 31, 1994. "in the event the sum of at least $1.5 million ... is paid ...." The words "in the event" create a condition. They do not create an obligation on Western to pay MindGames $1.5 million. Similarly, paragraph 2 provides that the license shall automatically renew for successive one year periods "provided that Licensees have paid to Licensor at least the Renewal Amount ...." This language also creates a condition. It imposes no duty on the licensee to pay a renewal fee.

■ Just because MindGames chose to treat the contract as a continuing one notwithstanding Western's non-payment of the $1.5 million or the renewal fees does not transform Western's right to pay the fees into a duty to pay them. The [n]on-occurrence of a condition is not a breach by a party unless he is under a duty that the condition occur. *Restatement (Second) of Contracts* § 225(3).[3] "Unless the obligee is under such a duty, the non-occurrence of the event gives rise to no claim against him." *Id.* at § 225 cmt.d.

I have found no provision in the licensing agreement that imposes upon Western a duty to pay the renewal fees. And MindGames has presented no evidence showing that Western's option to pay renewal fees was transformed into a duty to do so either in the form of an amendment to the licensing agreement or by a separate agreement of the parties. Payment of the $900,000 in renewal fees thus was a condition precedent to automatic renewal of the contract. It was a condition precedent that never occurred. Therefore, the contract did not automatically renew. The fact that MindGames and Western continued to work together did not retroactively turn the condition into an obligation. Even assuming the licensing agreement was revived by the March 6, 1993, addendum, the same analysis applies to MindGames's claim for the $300,000 renewal amount. Payment of $300,000 by Western was a condition precedent on which automatic renewal of the contract after January 31, 1994, depended. At no time did Western have a duty to pay it.

I believe that the Supreme Court of Arkansas would find that under Arkansas law Western's failures to make renewal payments constituted unperformed conditions precedent and that MindGames' decision to continue the arrangement in spite of nonperformance of the conditions did not transform the unperformed conditions into obligations. In the similar case of *Uebe v. Bowman,* 243 Ark. 531, 420 S.W.2d 889 (1967), the Arkansas high court addressed an option to extend a lease made between neighbors for the use of water from a spring. The clause at issue provided:

> 'That for said consideration the right herein conveyed shall continue ... for a fixed period of 16 years from this date, with the option to the party of the second part, his heirs and assigns, to continue said right in full force and effect by the payment of the sum of $25.00 annually, payable in advance.'

*Id.* at 531–32, 420 S.W.2d at 889. The facts showed that at the end of the 16–year term the lessee was unaware that the lease was ending and failed to pay the $25 by the expiration date.

As in the present case, after the expiration date the parties continued their arrangement unchanged, "without mentioning or giving credit for the $25 annual payment provided in the lease agreement." *Id.* at 532, 420 S.W.2d at 890. The lessee continued to use the water from the spring and the lessor made no complaint or comment about it for three years. Nevertheless, according to the Supreme Court of Arkansas:

> When the option to extend here involved is read in its entirety, we hold that the trial court properly construed the provision for a payment 'of the sum of $25 annually, payable in advance' as a condition precedent to the exercise of the extension.

*Id.* at 533, 420 S.W.2d at 890. Because the $25 had not been paid before the lease expiration date the lease had terminated and the lessor had the right to order the former lessee to quit using the spring. *Id.* at 532–34, 420 S.W.2d at 890–91.

---

3. Arkansas courts have previously turned to the Restatement (Second) of Contracts regarding conditions precedent. *See Stacy v. Williams,* 38 Ark.App. 192, 198, 834 S.W.2d 156, 159 (1992) (citing Restatement (Second) of Contracts § 226 cmt. a).

Paragraph 2 addresses only the issue of how the contract would automatically renew. MindGames admits that automatic renewal did not occur and the license agreement, by its terms, *expired* on January 31, 1993, because Western did not pay the $900,000 renewal amount shortfall. Memorandum in Opposition (Dec. 16, 1997) at 2. Notwithstanding the failure of the contract to renew automatically because of the non-occurrence of the condition required by paragraph 2, the parties of course were free to extend, renew, or revive the licensing arrangement on whatever terms they wished.[4] It is undisputed that the parties negotiated to do just that. What the result of those negotiations was, however, is disputed by the parties. Western argues that the parties had a legally binding oral agreement to extend the contract until January 31, 1994, in exchange for guaranteed royalty payments to MindGames of $27,500, and that this oral agreement was later reduced to writing. MindGames contends that no "meeting of the minds" ever took place about extending the contract past January 31, 1993, and, if it did, it had no legally binding effect because it was not in writing. Both parties put in issue what Blackwell and Letourneau intended or had the authority to agree to during their negotiations at the 1993 Toy Fair.

The dispute about what the parties may have agreed to after the contract failed to renew *automatically* is tangential to this motion. Neither party claims that any oral or written extension of the licensing agreement imposed a duty on Western to pay $900,000 or $300,000 in renewal fees. The statement in the addendum that "[a]ll other provisions from the licensing agreement . . . will remain in effect" imposed no obligation upon Western to pay such sums for the simple reason that the licensing agreement itself did not create any such duty.

According to MindGames, Blackwell "saw no point in restating in the March 1993 addendum Western's obligation to pay the $900,000 renewal amount because the 1990 Agreement clearly obligated it to do so." Memorandum in Opposition (Dec. 16, 1997) at 8. He "believe[d] that Western became obligated to pay the $900,000 figure if [it]

continued with *Clever Endeavor*." Blackwell Dep. at 444. The fact that Blackwell believed this doesn't make it so. The fact is that the language of the licensing agreement never imposed a duty on Western to pay such a sum.

This motion can be resolved based on the language of the contract. The language is clear and there can be little dispute over its meaning. Moreover, no subsequent agreement, whether verbal or written, obligated Western to pay MindGames $900,000 or $300,000. MindGames, in any event, argues that the parties never came to any agreement on extension or, alternatively, that any verbal agreement fails because it was not put in writing. Thus, without any agreement, written or verbal, by Western in which it obligated itself to pay the renewal amounts, liability cannot be found. Trial on this issue is unnecessary.

**THEREFORE, IT IS ORDERED** that Western's motion for partial summary judgment is **GRANTED**.

---

4. While paragraph 2 addresses automatic extensions of the licensing agreement, no provision of the agreement specifically addresses other forms of renewal or extension.