In the
United States Court of Appeals
For the Seventh Circuit

No. 98-1879

MindGames, Inc.,

Plaintiff-Appellant,

v.

Western Publishing Company, Inc.,

Defendant-Appellee.

Appeal from the United States District Court
for the Eastern District of Wisconsin.
Nos. 94-C-552, 94-C-998--Lynn S. Adelman,
Judge.

Argued April 17, 2000--Decided June 22, 2000

Before Posner, Chief Judge, and Fairchild
and Diane P. Wood, Circuit Judges.

Posner, Chief Judge.  This is a diversity
suit for breach of contract, governed by
Arkansas law because of a choice of law
provision in the contract. The plaintiff,
MindGames, was formed in March of 1988 by
Larry Blackwell to manufacture and sell
an adult board game, "Clever Endeavor,"
that he had invented. The first games
were shipped in the fall of 1989 and by
the end of the year, 75 days later,
30,000 had been sold. In March of 1990,
MindGames licensed the game to the
defendant, Western, a major marketer of
games. Western had marketed the very
successful adult board games "Trivial
Pursuit" and "Pictionary" and thought
"Clever Endeavor" might be as successful.
The license contract, on which this suit
is premised, required Western to pay
MindGames a 15 percent royalty on all
games sold. The contract was by its terms
to remain in effect until the end of
January of 1993, or for another year if
before then Western paid MindGames at
least $1.5 million in the form of
royalties due under the contract or
otherwise, and for subsequent years as
well if Western paid an annual renewal

fee of $300,000.

During the first year of the contract, Western sold 165,000 copies of "Clever Endeavor" and paid MindGames $600,000 in royalties. After that, sales fell precipitously (though we're not told by how much) but the parties continued under the contract through January 31, 1994, though Western did not pay the $900,000 ($1.5 million minus $600,000) that the contract would have required it to pay in order to be entitled to extend the contract for a year after its expiration. In February of 1994 the parties finally parted. Later that year MindGames brought this suit, which seeks $900,000, plus lost royalties of some $40 million that MindGames claims it would have earned had not Western failed to carry out the promotional obligations that the contract imposed on it, plus $300,000 on the theory that Western renewed the contract for a third year, beginning in February of 1994; Western sold off its remaining inventory of "Clever Endeavor" in that year.

The district court granted summary judgment for Western, holding that the contract did not entitle MindGames to a renewal fee and that Arkansas's "new business" rule barred any recovery of lost profits. 944 F. Supp. 754 (E.D. Wis. 1996); 995 F. Supp. 949 (E.D Wis. 1998). Although the victim of a breach of contract is entitled to nominal damages, Mason v. Russenberger, 542 S.W.2d 745 (Ark. 1976); Movitz v. First Nat. Bank of Chicago, 148 F.3d 760, 765 (7th Cir. 1998); E. Allan Farnsworth, Contracts sec. 12.8, p. 784 (3d ed. 1999), MindGames does not seek them; and so if it is not entitled to either type of substantial damages that it seeks, judgment was correctly entered for Western. By not seeking nominal damages, incidentally, MindGames may have lost a chance to obtain significant attorneys' fees, to which Arkansas law entitles a prevailing party in a breach of contract case. See Dawson v. Temps Plus, Inc., 987 S.W.2d 722, 729 (Ark. 1999).

The rejection of MindGames' claim to the renewal fee for the second year (and a fortiori the third) was clearly correct. The contract conditioned Western's right to renew the contract for a second year on its paying a renewal fee of $1.5

million (minus royalties already paid); it was silent on the terms of a renewal adopted by a new agreement of the parties rather than by the exercise of an option granted by the original contract. If MindGames hadn't wanted to renew the contract and Western had insisted, then Western would have had to pay the fee. But if Western did not invoke a contractual right to renew, if instead the parties entered into a new agreement to renew the contract, then MindGames had no right to the renewal fee fixed in the contract; that right was conditional on Western's exercising its contractual right to renew. A conditional right in a contract does not become an enforceable right until the condition occurs, Restatement (Second) of Contracts sec. 225(1) (1981), unless noncompliance with the condition is excused by agreement, Uebe v. Bowman, 420 S.W.2d 889 (Ark. 1967); Normand v. Orkin Exterminating Co., 193 F.3d 908, 912 (7th Cir. 1999), or by operation of law, Farnsworth, supra sec. 8.3, p. 526, as where the other party to the contract wrongfully prevents the condition from occurring, id., sec. 8.6, pp. 544-45; Restatement, supra, sec. 225, comment b, which is not alleged, for Western had no duty to exercise its right of renewal. The condition that would have entitled MindGames to demand a renewal fee thus did not occur here; Western did not invoke its contractual right to extend the contract; after January 31, 1993, the parties were operating under a new contract.

The more difficult issue is MindGames' right to recover lost profits for Western's alleged breach of its duty to promote "Clever Endeavor." A minority of states have or purport to have a rule barring a new business, as distinct from an established one, from obtaining damages for lost profits as a result of a tort or a breach of contract. E.g., Lockheed Information Management Systems Co. v. Maximus, Inc., 524 S.E.2d 420, 429-30 (Va. 2000); Bell Atlantic Network Services, Inc. v. P.M. Video Corp., 730 A.2d 406, 419-20 (N.J. Super. 1999); Interstate Development Services of Lake Park, Georgia, Inc. v. Patel, 463 S.E.2d 516 (Ga. App. 1995); Stuart Park Associates Limited Partnership v. Ameritech Pension Trust, 51 F.3d 1319, 1328 (7th Cir. 1995) (Illinois law); Bernadette J. Bollas, Note, "The New

Business Rule and the Denial of Lost Profits," 48 Ohio St. L. J. 855, 859 & n. 32 (1987). The rule of Hadley v. Baxendale, 9 Ex. 341, 156 Eng. Rep. 145 (1854), often prevents the victim of a breach of contract from obtaining lost profits, but that rule is not invoked here. Neither the "new business" rule nor the rule of Hadley v. Baxendale stands for the general proposition that lost profits are never a recoverable item of damages in a tort or breach of contract case.

Arkansas is said to be one of the "new business" rule states on the strength of a case decided by the state's supreme court many years ago. The appellants in Marvell Light & Ice Co. v. General Electric Co., 259 S.W. 741 (Ark. 1924), sought to recover the profits that they claimed to have lost as a result of a five and a half month delay in the delivery of icemaking machinery; the delay, the appellants claimed, had forced them to delay putting their ice factory into operation. The court concluded, however, that because there was no indication "that the manufacture and sale of ice by appellants was an established business so that proof of the amount lost on account of the delay . . . might be made with reasonable certainty," "the anticipated profits of the new business are too remote, speculative, and uncertain to support a judgment for their loss." It quoted an earlier decision in which another court had said that "he who is prevented from embarking in [sic--must mean 'on'] a new business can recover no profits, because there are no provable data of past business from which the fact that anticipated profits would have been realized can be legally deduced." Central Coal & Coke Co. v. Hartman, 111 Fed. 96, 99 (8th Cir. 1901). That quotation is taken to have made Arkansas a "new business" state, although the rest of the Marvell opinion indicates that the court was concerned that the anticipated profits of the particular new business at issue, rather than of every new business, were too speculative to support an award of damages. On its facts, moreover, Marvell was a classic Hadley v. Baxendale type of case--in fact virtually a rerun of Hadley, except that the appellants alleged that they had notified the seller of the icemaking machinery of the damages that they would suffer if delivery was

delayed, and the seller had agreed to be liable for those damages. The decision is puzzling in light of that allegation; it is doubly puzzling because, assuming that by the time of the trial the ice factory was up and running, it should not have been difficult to compute the damages that the appellants had lost by virtue of the five and a half month delay in placing the factory in operation. Presumably it would have had five and a half months of additional profits.

Marvell has never been overruled; and federal courts ordinarily take a nonoverruled decision of the highest court of the state whose law governs a controversy by virtue of the applicable choice of law rule to be conclusive on the law of the state. E.g., Milwaukee Metropolitan Sewerage District v. Fidelity & Deposit Co., 56 F.3d 821, 823 (7th Cir. 1995); C & B Sales & Service, Inc. v. McDonald, 111 F.3d 27, 29 n. 1 (5th Cir. 1997); New York Life Ins. Co. v. K N Energy, Inc., 80 F.3d 405, 409 (10th Cir. 1996). But this is a matter of practice or presumption, not of rule. The rule is that in a case in federal court in which state law provides the rule of decision, the federal court must predict how the state's highest court would decide the case, and decide it the same way. Treco, Inc. v. Land of Lincoln Savings & Loan, 749 F.2d 374, 377 (7th Cir. 1984); New Hampshire Ins. Co. v. Vieira, 930 F.2d 696, 701 (9th Cir. 1991); 19 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure sec. 4507, pp. 126-50 (2d ed. 1996). Law, Holmes said, in a controversial definition that is, however, a pretty good summary of how courts apply the law of other jurisdictions, is just a prediction of what the courts of that jurisdiction would do with the case if they got their hands on it. Oliver Wendell Holmes, "The Path of the Law," 10 Harv. L. Rev. 457, 461 (1897). Since state courts like federal courts do occasionally overrule their decisions, there will be occasional, though rare, instances in which the best prediction of what the state's highest court will do is that it will not follow its previous decision. See, e.g., Burgess v. Lowery, 201 F.3d 942, 948 (7th Cir. 2000); Treco, Inc. v. Land of Lincoln Savings & Loan, supra, 749 F.2d at 377; Lightning Lube, Inc. v.

Witco Corp., 4 F.3d 1153, 1176 (3d Cir. 1993); 19 Wright, Miller & Cooper, supra, sec. 4507, pp. 141-49.

That is the best prediction in this case. Marvell was decided more than three quarters of a century ago, and the "new business" rule which it has been thought to have announced has not been mentioned in a published Arkansas case since. The opinion doesn't make a lot of sense on its facts, as we have seen, and the Eighth Circuit case on which it relied has long been superseded in that circuit. See, e.g., Central Telecommunications, Inc. v. TCI Cablevision, Inc., 800 F.2d 711, 727-28 (8th Cir. 1986). The Arkansas cases decided since Marvell that deal with damages issues exhibit a liberal approach to the estimation of damages that is inconsistent with a flat rule denying damages for lost profits to all businesses that are not well established. Jim Halsey Co. v. Bonar, 683 S.W.2d 898, 902-03 (Ark. 1985); Tremco, Inc. v. Valley Aluminum Products Corp., 831 S.W.2d 156, 158 (Ark. App. 1992); Ozark Gas Transmission Systems v. Barclay, 662 S.W.2d 188, 192 (Ark. App. 1983); J.W. Looney, "The 'New Business Rule' and Breach of Contract Claims for Lost Profits: Playing Mindgames with Arkansas Law," 1997 Ark. L. Notes 43, 46-47. The Ozark decision, for example, allowed an orchard farmer to recover for the damages to a new orchard. The "new business" rule has, moreover, been abandoned in most states that once followed it, e.g., Beverly Hills Concepts, Inc. v. Schatz & Schatz, Ribicoff & Kotkin, 717 A.2d 724, 733-35 (Conn. 1998); AGF, Inc. v. Great Lakes Heat Treating Co., 555 N.E.2d 634, 637-39 (Ohio 1990); No Ka Oi Corp. v. National 60 Minute Tune, Inc., 863 P.2d 79, 81-82 (Wash. App. 1993); Orchid Software, Inc. v. Prentice-Hall, Inc., 804 S.W.2d 208, 210-11 (Tex. App. 1991); Beck v. Clarkson, 387 S.E.2d 681, 683-84 (S.C. App. 1989); see also McNamara v. Wilmington Mall Realty Corp, 466 S.E.2d 324, 330 (N.C. App. 1996); International Telepassport Corp. v. USFI, Inc., 89 F.3d 82, 85-86 (2d Cir. 1996) (per curiam) (New York law); Restatement, supra, sec. 352, comment b, and it seems to retain little vitality even in states like Virginia, which purport to employ the hard-core per se approach. See Commercial Business Systems, Inc. v. Bellsouth Services, Inc., 453 S.E.2d 261, 268-69

(Va. 1995); see generally Eljer Mfg., Inc. v. Kowin Development Corp., 14 F.3d 1250, 1256 (7th Cir. 1994).

Western tries to distinguish Ozark by pointing to the fact that the plaintiff there was an established orchard farmer, albeit the particular orchard represented a new venture for him. This effort to distinguish that case brings into view the primary objection to the "new business" rule, an objection of such force as to explain its decline and make it unlikely that Arkansas would follow it if the occasion for its supreme court to choose arose. The objection has to do with the difference between rule and standard as methods of legal governance. A rule singles out one or a few facts and makes it or them conclusive of legal liability; a standard permits consideration of all or at least most facts that are relevant to the standard's rationale. A speed limit is a rule; negligence is a standard. Rules have the advantage of being definite and of limiting factual inquiry but the disadvantage of being inflexible, even arbitrary, and thus overinclusive, or of being underinclusive and thus opening up loopholes (or of being both over- and underinclusive!). Standards are flexible, but vague and open-ended; they make business planning difficult, invite the sometimes unpredictable exercise of judicial discretion, and are more costly to adjudicate--and yet when based on lay intuition they may actually be more intelligible, and thus in a sense clearer and more precise, to the persons whose behavior they seek to guide than rules would be. No sensible person supposes that rules are always superior to standards, or vice versa, though some judges are drawn to the definiteness of rules and others to the flexibility of standards. But that is psychology; the important point is that some activities are better governed by rules, others by standards. States that have rejected the "new business" rule are content to control the award of damages for lost profits by means of a standard--damages may not be awarded on the basis of wild conjecture, they must be proved to a reasonable certainty, e.g., Beverly Hills Concepts, Inc. v. Schatz & Schatz, Ribicoff & Kotkin, supra, 717 A.2d at 733-34; AGF, Inc. v. Great Lakes Heat Treating Co., supra, 555 N.E.2d at

638-39--that is applicable to proof of damages generally. See, e.g., Jones Motor Co. v. Holtkamp, Liese, Beckemeier & Childress, P.C., 197 F.3d 1190, 1194-95 (7th Cir. 1999), and cases cited there; Ashland Management Inc. v. Janien, 624 N.E.2d 1007, 1010 (N.Y. 1993); Restatement, supra, sec. 352. The "new business" rule is an attempt now widely regarded as failed to control the award of such damages by means of a rule.

The rule doesn't work because it manages to be at once vague and arbitrary. One reason is that the facts that it makes determinative, "new," "business," and "profits," are not facts, but rather are the conclusions of a reasoning process that is based on the rationale for the rule and that as a result turns the rule into an implicit standard. What, for example, is a "new" business? What, for that matter, is a "business"? And are royalties what the rule means by "profits"? MindGames was formed more than a year before it signed the license agreement with Western, and it sold 30,000 games in the six months between the first sales and the signing of the contract. MindGames' only "business," moreover, was the licensing of intellectual property. An author who signs a contract with a publisher for the publication of his book would not ordinarily be regarded as being engaged in a "business," or his royalties or advance described as "profits." He would be surprised to learn that if he sued for unpaid royalties he could not get thembecause his was a "new business." Suppose a first-time author sued a publisher for an accounting, and the only issue was how many copies the publisher had sold. Under the "new business" rule as construed by Western, the author could not recover his lost royalties even though there was no uncertainty about what he had lost. So construed and applied, the rule would have no relation to its rationale, which is to prevent the award of speculative damages.

Western goes even further, arguing that even if it, Western, a well-established firm, were the plaintiff, it could not recover its lost profits because the sale of "Clever Endeavor" was a new business. On this construal of the rule, "business" does not mean the enterprise; it means any business activity. So Western's sale

of a new game is a new business, yet we know from the Ozark decision that an orchard farmer's operation of a new orchard is an old business.

The rule could be made sensible by appropriate definition of its terms, but we find it hard to see what would be gained, given the existence of the serviceable and familiar standard of excessive speculativeness. The rule may have made sense at one time; the reduction in decision costs and uncertainty brought about by avoiding a speculative mire may have swamped the increased social costs resulting from the systematically inadequate damages that a "new business" rule decrees. But today the courts have become sufficiently sophisticated in analyzing lost-earnings claims, and have accumulated sufficient precedent on the standard of undue speculativeness in damages awards, to make the balance of costs and benefits tip against the rule. In any event we are far in this case, in logic as well as time, from the ice factory whose opening was delayed by the General Electric Company. We greatly doubt that there is a "new business" rule in the common law of Arkansas today, but if there is it surely does not extend so far beyond the facts of the only case in which the rule was ever invoked to justify its invocation here. There is no authority for, and no common sense appeal to, such an extension.

But that leaves us with the question of undue speculation in estimating damages. Abrogation of the "new business" rule does not produce a free-for-all. What makes MindGames' claim of lost royalties indeed dubious is not any "new business" rule but the fact that the success of a board game, like that of a book or movie, is so uncertain. Here newness enters into judicial consideration of the damages claim not as a rule but as a factor in applying the standard. Just as a start-up company should not be permitted to obtain pie-in-the-sky damages upon allegations that it was snuffed out before it could begin to operate (unlike the ice factory in Marvell, which did begin production, albeit a little later than planned), capitalizing fantasized earnings into a huge present value sought as damages, so a novice writer should not be permitted to obtain damages from his publisher on

the premise that but for the latter's laxity he would have had a bestseller, when only a tiny fraction of new books achieve that success. Damages must be proved, and not just dreamed, though "some degree of speculation is permissible in computing damages, because reasonable doubts as to remedy ought to be resolved against the wrongdoer." Jones Motor Co. v. Holtkamp, Liese, Beckemeier & Childress, P.C., supra, 197 F.3d at 1194; see Restatement, supra, sec. 352, comment a.

This is not to suggest that damages for lost earnings on intellectual property can never be recovered; that "entertainment damages" are not recoverable in breach of contract cases. That would just be a variant of the discredited "new business" rule. What is important is that Blackwell had no track record when he created "Clever Endeavor." He could not point to other games that he had invented and that had sold well. He was not in the position of the bestselling author who can prove from his past success that his new book, which the defendant failed to promote, would have been likely--not certain, of course--to have enjoyed a success comparable to that of the average of his previous books if only it had been promoted as promised. That would be like a case of a new business launched by an entrepreneur with a proven track record.

In the precontract sales period and the first year of the contract a total of 195,000 copies of "Clever Endeavor" were sold; then sales fizzled. The public is fickle. It is possible that if Western had marketed the game more vigorously, more would have been sold, but an equally if not more plausible possibility is that the reason that Western didn't market the game more vigorously was that it correctly sensed that demand had dried up.

Even if that alternative is rejected, we do not see how the number of copies that would have been sold but for the alleged breach could be determined given the evidence presented in the summary judgment proceedings (a potentially important qualification, of course); and so MindGames' proof of damages is indeed excessively speculative. See, e.g., Gentry v. Little Rock Road Machinery Co.,

339 S.W.2d 101, 104 (Ark. 1960); Hillside Enterprises v. Carlisle Corp., 69 F.3d 1410, 1414 (8th Cir. 1995); K & R, Inc. v. Crete Storage Corp., 231 N.W.2d 110, 115 (Neb. 1975); see also AGF, Inc. v. Great Lakes Heat Treating Co., supra, 555 N.E.2d at 640. Those proceedings were completed with no evidence having been presented from which a rational trier of fact could conclude on this record that some specific quantity, or for that matter some broad but bounded range of alternative estimates, of copies of "Clever Endeavor" would have been sold had Western honored the contract. MindGames obtained $600,000 in royalties on sales of 165,000 copies of the game, implying that Western would have had to sell more than 10 million copies to generate the $40 million in lost royalties that MindGames seeks to recover. Cf. Boxhorn's Big Muskego Gun Club, Inc. v. Electrical Workers Local 494, 798 F.2d 1016, 1023 (7th Cir. 1986).

When the breach occurred, MindGames should have terminated the contract and sought distribution by other means. See Farnsworth, supra, sec. 12.12, pp. 806–08. The fact that it did not do so--that so far as appears it has made no effort to market "Clever Endeavor" since the market for the game collapsed in 1991--is telling evidence of a lack of commercial promise unrelated to Western's conduct.

Although Western in its brief in this court spent most of its time misguidedly defending the "new business" rule, clinging to Marvell for dear life (a case seemingly on point, however vulnerable, is a security blanket that no lawyer feels comfortable without), it did argue that in any event MindGames' claim for lost royalties was too speculative to ground an award of damages for that loss. The argument was brief but not so brief as to fail to put MindGames on notice of a possible alternative ground for upholding the district court's judgment; we may of course affirm an award of summary judgment on any ground that has not been forfeited or waived in the district court. United States v. Jackson, 207 F.3d 910, 917 (7th Cir. 2000). MindGames did not respond to the argument in its reply brief. It pointed to no evidence from which lost royalties could be calculated to even a rough approximation. We find its silence

eloquent and Western's argument compelling, and so the judgment in favor of Western is

Affirmed.

Fairchild, Circuit Judge, dissenting in part. I agree that (1) MindGames' claim for a renewal fee for the year following the initial term of the Licensing Agreement was properly dismissed, and (2) we are not bound by Marvell Light & Ice Co. v. General Electric Co., 259 S.W. 741 (Ark. 1924) to affirm the dismissal of MindGames' claim for loss of royalties caused by breach of contract. I do, however, respectfully disagree with the conclusion that, as a matter of law, that claim is too speculative to support an award of damages.

This was never a claim in which MindGames sought to recover lost profits from the operation of a business. The damages sought would be measured by the royalties which Western would have been obliged to pay on sales which did not occur because of Western's alleged failure to perform its contract. Western's obligation to pay royalties arose from the sales of games manufactured, promoted and sold by it, and whether MindGames showed a profit, as well as MindGames' lack of history, was wholly irrelevant. The ultimate questions would be whether there was a breach by Western and whether the breach caused a loss of sales.

Sales did not meet expectations. In the period from March 30, 1990 to January 31,1991, 165,000 games were sold; in the year ending January 31, 1992, 58,113; in the year ending January 31, 1993, 26,394; and in the year after the initial term, 7,438. The sales in the initial term totaled approximately $4,000,000 and royalties $600,000. Soon after January 31, 1993, Western was sufficiently interested in continuing as licensee to agree to pay a minimum royalty of $27,500 for the coming year. MindGames' complaint

alleged that a substantial number of games produced by Western failed to meet quality standards; Western failed to promote and make reasonable efforts to sell; and its efforts did not meet standards under the agreement or those recognized in the industry. It is MindGames' position that these failures caused loss of sales.

Western's motion for partial summary judgment was premised on the new business rule which Western perceived as announced in Marvell, and the district court granted the motion on that basis. If, as we all agree, Marvell does not control this case, then the applicable Arkansas doctrine is that MindGames is entitled to recover any royalties on sales which MindGames can prove to a reasonable certainty would have been made had Western carried out the contract. The rule that damages which are uncertain cannot be recovered does not apply to uncertainty as to the value of the benefits to be derived, but to uncertainty as to whether any benefit would be derived at all. Jim Halsey Co., Inc. v. Bonar, 284 Ark. 461, 467-68 (Ark. 1985); Crow v. Russell, 226 Ark. 121, 123 (Ark. 1956).

In my opinion we cannot say on this record, as a matter of law, that MindGames can not prove to a reasonable certainty that Western's failures to perform, if proved, caused a loss of sales.

I would not hold that MindGames has waived or forfeited its opportunity to produce evidence of damages. It is true that in responding to Western's motion for partial summary judgment MindGames did not provide evidentiary material tending to show the breaches by Western nor that such breaches caused a loss of sales. This should not be deemed a waiver or forfeiture of an opportunity to do so because of Western's complete reliance in its motion on the new business rule and Marvell, which, if applied, would prevent proof of breach and causation of loss. Western's motion did not reach the issue of breach, and establishing damages would require MindGames to prove that the breach occurred and caused loss of sales. Although Western, in its memorandum in support of its motion did include a section making the point that the success

of a new product in the entertainment industry is especially difficult to predict, it used that point to support an argument that the new business rule was particularly appropriate in this case, and that the Arkansas Supreme Court would be unlikely to retreat from the new business rule under circumstances like these. Western did not squarely assert, as an alternative ground, that MindGames could not prove to a reasonable certainty that any breach by Western caused loss of sales. Rather, Western urged that the district court should strictly apply the new business rule.

In this court, Western again relied on Marvell and the new business rule, also arguing, as it had in the district court, that this type of case, involving a new product in the entertainment industry, is not one where the Arkansas Supreme Court would retreat from its application of the new business rule. Although at pages 30–32 of its brief it asserted the inherently speculative nature of a claim for lost profits in the entertainment industry, and cited cases, it failed squarely to assert, as an alternative ground, that its alleged failures to perform, if proved, could not have been proved to a reasonable certainty to have caused lost sales. On page 5 of its reply brief, MindGames referred to pages 29-32 of Western's brief, and challenged as contrary to Arkansas law "non-Arkansas cases [cited by Western] in arguing that businesses in the entertainment industry are barred per se from claiming lost profits." Again I do not think it is appropriate to rely on waiver or forfeiture.

I would remand for further proceedings on this part of MindGames' complaint.