In re Christian D. PETERSON, Debtor.

Desert Palace, Inc. d/b/a Caesars Palace, Plaintiff,

v.

Christian D. Peterson, Defendant.

Bankruptcy No. 10–11874.
Adversary No. 10–00155.

United States Bankruptcy Court,
W.D. Wisconsin.

Jan. 31, 2011.

Roy Leonard Prange, Jr., Quarles & Brady LLP, Madison, WI, for Plaintiff.

Rose M. Yanke, Madison, WI, for Defendant.

## MEMORANDUM DECISION

ROBERT D. MARTIN, Bankruptcy Judge.

To decide this plaintiff's motion for summary judgment, I recite the following facts alleged or presented with the motion or its defense without determining whether they could be proved at trial. The inferences drawn from the facts are in favor of the nonmoving defendant.

Desert Palace operates the gambling casino Caesars Palace ("Caesars") in Las Vegas, Nevada. The debtor Christian Peterson was a frequent gambler at the casino. On various occasions Caesars organized trips for Peterson to come to its casino to gamble. As an incentive, Caesars allowed Peterson to gamble on credit. In general, to obtain credit at Caesars patrons have to complete a credit application, establishing a fixed line of credit. Once the line of credit is established, patrons issue credit instruments called "markers" to Caesars, which then presents the instruments to the patron's bank. These "markers" operate and have the same effect as a personal check. In an earlier trip in 2007, Peterson completed a Harrah's Credit Application, requesting $300,000 of credit. On his application, he listed Park Bank in Milwaukee, with his bank account number, as the bank to which any markers could be presented. His application was approved.

In late March, 2008, Caesars' personnel started organizing another trip for Peterson to gamble and stay at their hotel and casino. During the pre-trip negotiations, Caesars offered Peterson a gambling credit limit of $400,000, promo chips, a private round-trip jet trip from Madison to Las Vegas, and a 10–room suite. Peterson accepted this offer, and soon thereafter he executed another Credit Application, seeking authorization for the $400,000 credit limit. On this application, he again listed Park Bank and his account number but did not indicate where Park Bank was located. On April 20, 2008, Peterson and several friends boarded Caesars' private jet to Las Vegas for a two day, two-night trip.

During the first night of gambling Peterson won roughly $1.5 million. These

funds were held for Peterson in a deposit account controlled by Caesars. During the second night of gambling, Peterson claims that he continued to gamble despite being highly intoxicated after consuming large amounts of alcohol. He also claims that he was unaware of how much money he lost that night, but was told by Caesars' personnel that he was "playing on the rim." It was not until later that he learned that he had exhausted both his $400,000 approved credit limit, and his $1.5 million winnings from the prior night. He also later learned that "playing on the rim" meant he was playing with borrowed funds. Caesars claims that while gambling that night, Peterson executed a "Credit Limit Increase Report," requesting an additional $2 million of credit. By the end of his second night of gambling, Caesars claimed Peterson had lost a total of $3.5 million. To cover this loss, Caesars alleges Peterson signed a marker for that amount.

Peterson's jet back to Madison was scheduled to depart at 7:00 a.m. following his second night of gambling. Forty-five minutes into the flight, the pilot notified the passengers that they had to turn around due to "engine trouble." One passenger questioned why they were heading back to Las Vegas, rather than landing the plane more quickly at a closer airport. The pilot responded that his directions were to return to Las Vegas. Upon arrival in Las Vegas, Peterson was greeted in the hangar by Caesars' personnel who, Peterson alleges, instructed him to sign a "marker" for the $3.5 million that Peterson had lost the previous night. Peterson refused and was told he could not leave until he signed the instrument. Thereafter, Peterson contacted local counsel who advised him to sign the marker under duress. Peterson executed the document and the group returned to Madison. Upon presentment of the marker, Park Bank in Mil-

waukee dishonored the check and noted that there was "no account found." Peterson did have a bank account with the same account number as the one noted on his Credit Application, however the account was held by Park Bank in Madison, not Milwaukee.

On June 5, 2008, Peterson filed a lawsuit against Caesars alleging false imprisonment, intentional and negligent infliction of emotional distress, civil conspiracy and *respondeat superior*. Caesars filed an answer and counterclaim, alleging that Peterson failed to honor a "credit instrument," and his "open account," when he did not repay it for the amount lent to him. Caesars' counterclaim also alleged claims for breach of contract and unjust enrichment. On August, 12, 2009, Peterson answered Caesars' counterclaim denying most of the allegations. For the next nine months, both parties participated in discovery. On April 2, 2009, Caesars moved for leave to file an amended counterclaim. About a week later, Peterson's attorney, Chris Rasmussen, filed an objection to Caesars' Motion. On May 11, 2009, the same day of the scheduled hearing on Caesars' Motion for Leave to Amend, Rasmussen filed a motion to withdraw as Peterson's attorney. After this time, Peterson claims that he was unaware of the status of his case. On May 20, 2009, the Nevada District Court of Clark County entered an Order Allowing Caesars to amend its Counterclaim. Caesars filed an Answer to Amended Complaint and Amended Counterclaim on May 21, 2009, adding a claim for fraud. On November 17, 2009, the Nevada District Court entered a default judgment against Peterson for $2.6 million. Based on Caesars' amended counterclaim, the District Court made specific findings of fraud. In its Order, the court stated that "Caesars has proven by competent and admissible evi-

dence, and the Court finds by clear and convincing evidence, that Plaintiff [Peterson] committed fraud against Caesars causing damage to Caesars in the amount of $1.945 million." The Order went on to make a finding on each element required to establish fraud in Nevada. Peterson alleges that he was not aware of the District Court's Order until Thanksgiving of 2009.

On March 16, 2010, Peterson filed for relief under chapter 7. Caesars then commenced this adversary proceeding, objecting to the dischargeability of its debt under § 523(a)(2)(A) & (B). Caesars now moves for summary judgment, arguing that the doctrine of issue preclusion determines the outcome of this case. Because the Nevada District Court has already found Peterson liable for fraud, it claims this Court is precluded from re-litigating the facts supporting that finding.

In opposition to the Motion, Peterson argues that issue preclusion does not apply because the Nevada Judgment was a default judgment, and the case was not actually litigated on the merits. It claims that Caesars cannot satisfy all the required elements of issue preclusion and therefore, there is no basis on which summary judgment can be granted.

If this Court is bound to accept the finding of the Nevada Court, the factual predicate for plaintiff's requested relief is established beyond dispute and summary judgment is appropriate. Rule 56(c), incorporated into FED.R.BANKR.P. 7056, provides that summary judgment shall be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The primary purpose of a summary judgment is to avoid trial where there is no genuine issue of material fact in dispute. *See Trautvetter v. Quick*, 916 F.2d 1140, 1147 (7th Cir.1990).

██ Under the Full Faith and Credit Act, federal courts must apply state law and recognize the preclusive effect of previous state court proceedings. *See Dollie's Playhouse, Inc. v. Nable Excavating, Inc.*, 481 F.3d 998, 1000 (7th Cir.2007) (recognizing that federal courts must give the same preclusive effect to state court judgments, as would be given in state court). To apply issue preclusion, Nevada law requires: (1) the issue decided in the prior litigation be identical to the issue presented in the current action; (2) the initial ruling be final and on the merits; (3) the party against whom the judgment is asserted be a party or in privity with a party in the prior case; and (4) the issue be actually and necessarily litigated. *Five Star Capital Corp. v. Ruby*, 194 P.3d 709 (Nev.2008). A party seeking to assert a judgment against another has the burden of establishing the preclusive effect of the judgment. *See Bennett v. Fidelity & Deposit Co. of Maryland*, 98 Nev. 449, 452, 652 P.2d 1178 (Nev.1982). Summary judgment is appropriate where a claim is barred by issue preclusion. *See Kahn v. Morse & Mowbray*, 121 Nev. 464, 467, 117 P.3d 227 (Nev.2005).

The Nevada District Court judgment was final on the merits, and the parties and the issue in dispute in the two cases are identical. Thus the first, second and third elements of the issue preclusion analysis are not contested. The fourth element is the only one still in dispute. I find that it has not been established. For the following reasons, summary judgment must be denied.

██ The fourth element requires that the issue in the first action, "be actually

and necessarily litigated." *Five Star,* 194 P.3d at 713. The "actually litigated" element was only recently added to the issue preclusion analysis by the Nevada Supreme Court. *See Id.* There is little Nevada case law discussing what factual situation could be deemed "actually litigated," but a case decided in 2010 produced a holding which we must apply to the present facts. *See In re Sandoval,* 232 P.3d 422 (Nev.2010). Where a state's highest court has not addressed a particular application of state law, "the federal court must predict how the state's highest court would have decided the case and decide it the same way." *MindGames, Inc. v. Western Pub. Co.,* 218 F.3d 652, 655 (7th Cir.2000). But where a state's highest court has addressed the issue with clarity in a holding, this Court's responsibility is to follow that ruling and reasoning.

[6–8] In Nevada, default judgments are generally not given preclusive effect. *In re Sandoval,* 232 P.3d 422 (Nev.2010). The *Sandoval* court noted other courts' recognition of exceptions to a total denial of default judgments, but held that "[w]hen a default judgment is entered where an answer has not been filed, the issue presented was not actually and necessarily litigated, and issue preclusion does not apply in such circumstances." *Id.* at 425. The record in the first case must be clear in reflecting that both sides were actually involved in litigating the issue adjudicated. *See Univ. of Nevada v. Tarkanian,* 110 Nev. 581, 599, 879 P.2d 1180 (Nev.1994) (analyzing the record to determine whether both parties litigated facts necessary to a particular claim).

█ Here, Peterson never litigated the issue of fraud. Peterson stopped pursuing his case on, or shortly after, May 11, 2009. On May 21, 2009, Caesars filed an amended counterclaim alleging fraud. Before that date, Caesars had not alleged fraud.

Peterson claims that he had no knowledge of Caesars' amended counterclaim. He never responded to the Amended Counterclaim and he never filed an amended answer. As the Nevada Supreme Court determined—where no answer has been filed and a default judgment is entered, the issue involved has not been actually and necessarily litigated. *Sandoval,* 232 P.3d at 425.

█ It is also important to note that in Nevada issue preclusion does not apply to matters that simply could have been litigated, but were not. *See Kahn v. Morse & Mowbray,* 121 Nev. 464, 117 P.3d 227 (Nev.2005). Peterson commenced the action in Nevada that subsequently gave rise to Caesars' counterclaim. But he did not raise the issue of fraud in his pleadings and neither did Caesars so long as Peterson was actively pursuing the litigation.

█ The Nevada Supreme Court has long recognized that issue preclusion is based on the policy that both parties had a "full and fair opportunity to litigate." *Bower v. Harrah's Laughlin, Inc.* 125 Nev. 37, 215 P.3d 709 (Nev.2009) (citing *Thompson v. City of North Las Vegas,* 108 Nev. 435, 439–40, 833 P.2d 1132 (Nev.1992)). Peterson's opportunity may have been full, in the sense he could have proceeded with the litigation, but it was not necessarily fair. Caesars amended its counterclaim some ten days after Peterson's attorney filed a motion to withdraw and at which time Peterson ceased to participate in any further action taken by Caesars. Peterson claims that he was never aware of the claim for fraud and, consequently, never filed an amended answer. On November 17, 2009, a default judgment was entered against him, finding that Peterson was liable for fraud. The determination of fraud made against Peterson by the District Court did not consider any evidence other

than that presented by Caesars. Thus, viewing the facts as most favorable to the nonmoving party, Peterson was not afforded a fair opportunity to litigate the issue of fraud, and the policy underlying issue preclusion is not fulfilled.

Caesars Palace has not met its burden in establishing all four elements of issue preclusion under Nevada law. For these reasons, this Court must deny its motion for summary judgment.

### ORDER

The Court having reached the conclusions of law contained in the memorandum decision filed this date, it is hereby ORDERED that the Plaintiff's motion for summary judgment be DENIED.